E-FILED
Wednesday, 13 April, 2022 07:23:59 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

JANET BEPPLER, as Administrator of the
Estate of JEFFREY EASTMAN,

      Plaintiff,

      v.

WEXFORD HEALTH SOURCES, INC.;
GEORGE DUNCAN; PERCY MYERS;
AMBER BRAUN; CHELSEY DAVIS;
CAROL MANSFIELD; and T. MARTY,

      Defendants.

Case No.

JURY TRIAL DEMANDED

## **COMPLAINT**

Plaintiff Janet Beppler, as Administrator of the Estate of Jeffrey Eastman, by and through counsel, complains against defendants Wexford Health Sources, Inc., George Duncan, Percy Myers, Amber Braun, Chelsey Davis, Carol Mansfield, and T. Marty (together, "Defendants") as follows:

### Introduction

1.    Jeffrey Eastman died at Taylorville Correctional Center on April 12, 2021, from an aortic dissection.

2.    Jeffrey's death was entirely preventable. Just days earlier, Jeffrey had arrived in the health care unit just days earlier complaining of severe chest pain that radiated to his neck, difficulty breathing, and excessive sweating. These are clear signs of a cardiac emergency that requires emergency medical attention.

3.     Instead of sending Jeffrey to an emergency room or otherwise ensuring that he received the emergency treatment he needed, Defendants simply admitted him to the infirmary for the day before sending him back to his cell with only a prescription for an over-the-counter heartburn medication. Jeffrey was found dead in his cell approximately 48 hours later.

4.     Jeffrey was a beloved member of his family. He was taken away just months before he was scheduled to return home to the parents and siblings he so loved, thanks to Defendants' unconstitutional conduct. This action, brought pursuant to 42 U.S.C. § 1983, seeks to hold Defendants accountable for their misconduct.

## Jurisdiction and Venue

5.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

6.     Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## Parties

7.     Plaintiff Janet Beppler is the mother of Jeffrey Eastman, and the duly appointed Administrator of the Estate of Jeffrey Eastman. Jeffrey Eastman's estate was filed in Circuit Court of Richland County, Illinois.

8.     At all times relevant to the events at issue in this case, Jeffrey Eastman was in the custody of the Illinois Department of Corrections (IDOC). At

the time of his death, he was incarcerated at Taylorville Correctional Center (Taylorville).

9.      Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquartered in Pennsylvania and doing business in Illinois. Wexford, pursuant to one or more contracts with the State of Illinois, is a healthcare provider for IDOC prisons throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of policies and practices at Taylorville and the IDOC generally. Wexford was at all times acting under color of law by and through its agents, including the individual Defendants and other unknown healthcare employees at Taylorville.

10.      Defendant George Duncan was, at all relevant times, a physician employed by Wexford to treat patients at Taylorville. Defendant Dr. Duncan is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Dr. Duncan was acting under color of law and within the scope of his employment with Wexford.

11.      Defendant Dr. Percy Myers was, at all relevant times, a physician working at Taylorville. Defendant Dr. Myers is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Dr. Myers was acting under color of law and within the scope of his employment with Wexford.

12.      Defendant Nurse Amber Braun was, at all relevant times, a nurse working at Taylorville. Defendant Braun is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Braun was acting

3

under color of law.

13.     Defendant Nurse Chelsea Davis was, at all relevant times, a nurse working at Taylorville. Defendant Davis is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Davis was acting under color of law.

14.     Defendant Nurse Carol Mansfield was, at all relevant times, a nurse working at Taylorville. Defendant Mansfield is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Mansfield was acting under color of law.

15.     Defendant Nurse T. Marty was, at all relevant times, a nurse working at Taylorville. Defendant Marty is sued here in his or her individual capacity. At all times relevant to the events at issue in this case, Defendant Marty was acting under color of law.

## Allegations

16.     At the time of his death, Jeffrey Eastman was 35 years old. He died just 5 days shy of his 36th birthday.

17.     Jeffrey was deeply loved by his family. Nearly every time he talked or visited with the family; Jeffrey always made sure to ask after his family members. At home, Jeffrey never missed a holiday. His family knew him to be one of the best sources for a laugh or a pick-me-up on a particularly gloomy day.

18.     His parents and siblings had planned to delay the upcoming Christmas so that they could celebrate with Jeffrey after he returned home in January 2022.

4

19.    On the morning of April 9, 2021, prison staff called a "Code 3"—a code that refers to a medical emergency—for Jeffrey. Upon arrival to the healthcare unit, Jeffrey reported to nursing staff, including Defendants Braun and Davis, that he was suffering from "stabby" chest pain that radiated to his neck and jawbone. He rated the pain as a 9/10. Defendant Braun noted that Jeffrey was suffering from dyspnea (difficulty breathing) and reported that breathing in made the pain worse. Defendant Braun further noted that Jeffrey was excessively sweating.

20.    Jeffrey's signs and symptoms clearly indicated a medical emergency that required immediate evaluation and treatment by a physician or other provider. But nursing staff, including Defendants Braun and Davis, did not call 911. They did not take any other action to ensure that Jeffrey would be transported offsite to receive the emergency medical he so obviously needed.

21.    Instead, nursing staff called Defendant Dr. Duncan, an offsite physician employed by Wexford. Dr. Duncan knew that there was a substantial likelihood that Jeffrey was experiencing a medical emergency that required emergency medical treatment at an offsite hospital. But rather than order that he be transferred emergently to an emergency department or other hospital for evaluation or treatment, Dr. Duncan simply admitted him to Taylorville's infirmary for observation.

22.    A few hours later, Defendant Mansfield encountered Jeffrey. Like Defendants Braun and Davis, Defendant Mansfield saw that Jeffrey was experiencing clear signs of a medical emergency that required transportation to an

5

emergency department or other hospital for evaluation and treatment. But like Defendants Braun and Davis, Defendant Mansfield did not call 911 or take any other action to ensure that Jeffrey would be transported offsite to receive the emergency medical he so obviously needed.

23.    Over the course of the next several hours, Jeffrey had a number of EKGs performed. Many of them were abnormal. The results were reported to Dr. Duncan, but Dr. Duncan did not order Jeffrey to be transported to an emergency department or other hospital for evaluation or treatment. Instead, he simply directed that another EKG be performed.

24.    Later that same day, Jeffrey encountered Defendant Marty. Defendant Marty noted that at the time of their encounter, Jeffrey rated his chest pain as a 7/8 and reported that the pain was radiating from his chest to his jaw and between his shoulder blades. Defendant Marty, like Defendants Mansfield, Braun, and Davis, knew that Jeffrey was likely experiencing a medical emergency. But like the other Defendants, Defendant T. Marty did not call 911 or take any other action to ensure that Jeffrey would be transported offsite to receive the emergency medical he so obviously needed.

25.    The following day, Jeffrey saw Defendant Dr. Myers. Dr. Myers knew that Jeffrey had been complaining of stabby chest pain that radiated to his neck, jaw, and shoulder blades and got worse when he inhaled, and was observed to be excessively sweating with shortness of breath. And he knew that the only actions

6

taken to assess Jeffrey's condition or treat him included a single dose of Motrin and multiple abnormal EKGs.

26.      Despite this knowledge, Dr. Myers took no meaningful steps to evaluate or treat Jeffrey. Instead, Dr. Myers simply prescribed Jeffrey an over-the-counter heartburn medication and sent him back to his cell.

27.      On April 12, Jeffrey was found unresponsive on the floor of the bathroom of his housing unit. He was pronounced dead at approximately 12:48 p.m.

28.      An autopsy was performed the next day, which determined that Jeffrey died of an aortic dissection.

## COUNT I
### 42 U.S.C. § 1983 – Deliberate Indifference (Eighth Amendment)
### All Defendants

29.      Each of the Paragraphs of this Complaint is incorporated herein.

30.      In the manner described more fully above, Defendants were aware that Jeffrey's medical condition caused him to face a substantial risk of serious harm without appropriate action.

31.      Despite that knowledge, Defendants failed to provide Jeffrey with proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

32.      Defendants' actions and failures to act were unreasonable and undertaken intentionally, with malice, and/or with reckless indifference to Jeffrey Eastman's rights.

7

33.     As a result of Defendants' unjustified and unconstitutional conduct, Jeffrey experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

34.     Defendants were deliberately indifferent to Jeffrey's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Jeffrey Eastman's rights.

35.     Jeffrey's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by the policies and practices of Defendant Wexford Health Sources, Inc.

36.     At all times relevant to the events at issue in this case, Defendant Wexford contract with the IDOC to provide healthcare to men housed in IDOC prisons, including Jeffrey. As the provider of healthcare services, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

37.     Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional staff at Danville and other prisons pursuant to which prisoners like Jeffrey with serious medical needs were routinely denied adequate medical care. It is common within the IDOC to see prisoners with clear symptoms of serious medical needs whose treatment is routinely delayed, ignored, or minimized by healthcare staff.  Despite knowledge of these problematic policies and practices, Defendant

Wexford did nothing to ensure that prisoners in IDOC received adequate medical care and access to medical care, thereby acting with deliberate indifference.

38.     Specifically, there exist policies and/or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare staff fail to adequately examine or diagnose patients in their care; (2) healthcare staff fail to create a sensible treatment plan for patients whose medical and mental health status clearly require the creation of a treatment plan; (3) healthcare staff fail to perform differential diagnoses; (4) healthcare staff fail or refuse to provide for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (5) healthcare staff either refuse or are prohibited from contacting emergency medical services (i.e., 911), even when such contact is emergently necessary, among others.

39.     These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services within the IDOC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Jeffrey's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

9

40.     The above-described practices, so well-settled as to constitute de facto policy within the IDOC, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

41.     Jeffrey Eastman's injuries were caused by employees of Wexford and/or the IDOC, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

## COUNT II
### 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)
### All Individual Defendants

42.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

43.     In the manner more fully described above, each of the Defendants had a reasonable opportunity to prevent the violation of Jeffrey Eastman's constitutional rights as set forth above had they been so inclined but failed to do so.

44.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Jeffrey's rights.

45.     As a direct and proximate result of their misconduct, Jeffrey Eastman's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

46.     Jeffrey's death was caused by employees of Wexford and/or the IDOC, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

10

## COUNT III
### 42 U.S.C. § 1983 – Conspiracy (Eighth Amendment)
### All Individual Defendants

47.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

48.     Defendants reached an agreement among themselves to deprive Jeffrey Eastman of his constitutional rights and to protect one another from liability for depriving Jeffrey of his constitutional rights, all as described in the various paragraphs of this complaint.

49.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

50.     The misconduct described in this count was undertaken intentionally, with malice, and/or with reckless indifference to Jeffrey's rights.

51.     As a direct and proximate result of the illicit prior agreement referenced above, Jeffrey Eastman's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

52.     Jeffrey's death was caused by employees of Wexford and/or the IDOC, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT IV
### 740 ILCS 180/1 – Wrongful Death
### All Defendants

53.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

54.     In the manner more fully described above, the actions of the Defendants breached the duty of care owed to prisoners in their care.

55.     Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

56.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Jeffrey Eastman suffered injuries, including death.

57.     Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

58.     Defendants' actions proximately caused Jeffrey great bodily harm and death, as well as great pain and suffering.

59.     Plaintiff Janet Beppler, and all other legally recognized family members, claim damages for the wrongful death of Jeffrey Eastman, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel, and advice, and for the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS 180/1, the Illinois Wrongful Death Act.

## COUNT V
### 755 ILCS 5/27-6 – Survival Action
### All Defendants

60.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

61.     In the manner more fully described above, the actions of the Defendants breached the duty of care owed to prisoners in their care.

62.     Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

63.     The misconduct described in this Count was undertaken with intentional disregard of Jeffrey Eastman's rights.

64.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Jeffrey suffered great conscious pain and suffering prior to his death.

65.     Jeffrey Eastman filed no relevant action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

66.     Plaintiff Janet Beppler, on behalf of the Estate of Jeffrey Eastman, claims damages for the conscious pain and suffering of Mr. Eastman, pursuant to 755 ILCS 5/27-6, commonly referred to as the Illinois Survival Act.

### COUNT VI
### Respondeat Superior
### Defendant Wexford

67.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

68.     In committing the acts alleged in the preceding paragraphs, the above-described Defendants were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment.

69.     Consequently, Defendant Wexford is liable for the actions of its employees acting within the scope of their employment under state law.

70.     Defendant Wexford, as private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Janet Beppler, as Administrator of the Estate of Jeffrey Eastman, hereby respectfully requests that this Court enter a judgment in her favor and against defendants Wexford Health Sources, Inc., George Duncan, Percy Myers, Amber Braun, Chelsey Davis, Carol Mansfield, and T. Marty, awarding compensatory damages, punitive damages, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 13, 2022

Respectfully Submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Sarah Grady
Rachel Brady
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com