E-FILED
Monday, 13 July, 2026  08:05:23 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANET BEPPLER, as Administrator of the Estate of Jeffrey Eastman, | ) ) ) | |
| Plaintiff, | ) | Case No. 22-cv-3052-CRL-DJQ |
| v. | ) ) ) ) | Hon. Colleen R. Lawless District Judge |
| WEXFORD HEALTH SOURCES, INC., et al., | ) ) ) | Hon. Douglas J. Quivey Magistrate Judge |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT WEXFORD'S
MOTION FOR SUMMARY JUDGMENT (DKT. 139)**

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................... 1

PLAINTIFF'S RESPONSE TO DEFENDANT WEXFORD'S STATEMENT OF FACTS ........ 2

    I.    Undisputed Material Facts ................................................................... 2

    II.    Disputed Material Facts ....................................................................... 9

    III.    Undisputed Immaterial Facts .............................................................. 31

PLAINTIFF'S ADDITIONAL MATERIAL FACTS .................................................... 32

LEGAL STANDARD ................................................................................................ 52

ARGUMENT ........................................................................................................... 53

    I.    Unrebutted Expert Opinion Identifies Widespread Practices of Deficient Care. ............ 53

    II.    Plaintiff's Comparators Are Sufficiently Similar ............................................ 62

    III.    Wexford Had Ample Notice of the Risk and Was Deliberately Indifferent ................... 64

    IV.    Contrary to Wexford's Contention, *Monell* Liability Does Not Hinge on Individual Liability ........................................................................ 66

    V.    Summary Judgment Is Not Warranted on Plaintiff's State-Law Claims ..................... 67

CONCLUSION ........................................................................................................ 67

**INTRODUCTION**

Plaintiff's evidence of *Monell* liability is overwhelming. As Plaintiff's unrebutted expert evidence demonstrates, Wexford systemically fails (1) to escalate patient care—whether to higher-level providers or offsite to a hospital and (2) to diagnose and manage basic conditions, opting instead to keep patients onsite in the prison infirmary, which is indisputably unequipped to handle medical emergencies. As in Jeffrey Eastman's case, that is often a death sentence.

Beyond Plaintiff's retained expert's analysis, the *Lippert* Reports—where court-appointed monitors assessed the IDOC's healthcare from 2014 through 2021—sounded the alarm about the exact deficiencies that caused Mr. Eastman's death. Despite the flashing red lights giving Wexford ample notice, the company did not change course. Worse yet, Wexford's corporate representative gave binding testimony admitting that the company utterly failed to develop specific guidelines to address its chronic failure to refer patients to emergency care despite years of notice from the *Lippert* monitors.

Faced with a mountain of evidence (and no expert to counter it), Wexford gins up unsupported limitations on *Monell* liability that have no basis in law. Specifically, Wexford contends that Plaintiff cannot prove liability under *Monell* without evidence that other prisoners were subjected to *precisely* the same constellation of deliberately indifferent conduct, and suffered identical harms, as Mr. Eastman himself. That is not the law. To the contrary, Plaintiff's adduced evidence is precisely the kind that courts have repeatedly held is sufficient to establish *Monell* liability under Section 1983. Wexford's arguments about the minor differences that exist between some of the many patients who suffered because of its indifference are, at best, arguments properly made to a jury. They are not grounds for summary judgment.

1

Simply put, because a reasonable jury could readily conclude that Wexford maintained widespread customs and practices of deficient medical care that were the moving force behind Mr. Eastman's death, the Court should deny Wexford summary judgment.

**PLAINTIFF'S RESPONSE TO DEFENDANT WEXFORD'S STATEMENT OF FACTS[1]**

Pursuant to Local Rule 7.1(D)(2)(b), Plaintiff responds to the statement of fact submitted by Defendant Wexford (Dkt. 139) as follows:

**I.      Undisputed Material Facts**

1.      As of April 9, 2021, decedent Jeffrey Eastman was 35 years old. Ex. D, Duncan dep., pg. 51. Ex. A, Medical Records at P000003.

4.      As of April 9, 2021, Eastman's medical records did not reflect a diagnosis of or treatment for diabetes. Ex. A, Medical Records, Bates P000035 (April 12, 2021, transfer summary showing chronic conditions of Tourette's, generalized anxiety disorder, depression, and hernia).

5.      As of April 9, 2021, Eastman's medical records did not reflect a diagnosis of or treatment for high cholesterol. Ex. A, Medical Records, Bates P000035 (April 12, 2021, transfer summary showing chronic conditions of Tourette's, generalized anxiety disorder, depression, and hernia).

8.      Dr. Duncan is a physician licensed in Illinois who worked for Wexford in 2021. Ex. D, Duncan dep., pg. 96, 120, 234.

10.      Dr. Myers is a physician licensed in Illinois who worked for Wexford in 2021. Ex. H, Myers dep., pg. 64, 171.

---

[1] Plaintiff refers to the third parties discussed by name in Defendant Wexford's Statement of Facts and in Plaintiff's Statement of Additional Material Facts by their unique initials and redacts their names from Defendant Wexford's facts to protect their identities, consistent with the protective orders entered in this case at Dkts. 43 and 53, while also protecting the public's interest in full transparency of judicial proceedings. *See, e.g.*, *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014) ("Secrecy in judicial proceedings is disfavored.").

11.    A Code 3 was called for Eastman just before 7:00 a.m. on April 9, 2021. Ex. B, Davis dep., pg. 245.

12.    Nurse Davis responded to Eastman's housing unit for the Code 3 for Eastman. Ex. B, Davis dep., pg. 19; 245-246.

14.    Eastman was alert and oriented and verbally responding to Davis. Ex. B, Davis dep., pg. 22.

15.    Nurse Davis performed an initial assessment of Eastman in the housing unit. Ex. B, Davis dep., pg. 23.

17.    Nurse Braun was waiting in the health care unit and assisted Davis in completing the assessment. Ex. B, Davis dep., pg. 23-24, 26-27.

18.    Nurse Braun documented the nursing assessment using the chest pain nursing protocol and Davis documented the associated call to Dr. Duncan. Ex. B, Davis dep., pg. 246-248; Ex. A, Medical Records at P000026-28.

19.    Nurse Davis took Eastman's vitals while Braun documented the assessment. Ex. B, Davis dep., pg. 249.

21.    Eastman described the pain as knife-like but deeper, concrete like stabby, pulsating to neck/jawbone. Ex. B, Davis dep., pg. 251; Ex. C, Braun dep., pg. 203-204; Ex. A, Medical Records at P000026-27.

22.    Eastman described his pain as a 9 out of 10. Ex. B, Davis dep., pg. 252; Ex. C, Braun dep., pg. 204; Ex. A, Medical Records at P000026-27.

25.    The records indicate Eastman reported deep breathing / exhalation worsens the pain and nothing improves it. Ex. B, Davis dep., pg. 254-255; Ex. C, Braun dep., pg. 209; Ex. A, Medical Records at P000026-27.

29.    In an emergency, nurses could instruct security staff to call 911 and send an individual to an outside hospital without first calling a physician. Ex. E, Mansfield dep., pg. 45; Ex. C, Braun dep., pg. 98; Ex. G, Martz dep., pg. 179-180.

30.    Nurse Braun noted Eastman was short of breath, diaphoretic (sweating) but his breath sounds and heart rhythm were within normal limits and that he reported no numbness, nausea or vomiting, cyanosis (blue or purple color to skin) or tenderness to palpation of the chest wall with skin color was noted as "pink" and skin temperature "warm/clammy." Ex. B, Davis dep., pg. 288-294; Ex. C, Braun dep., pg. 216-220; Ex. A, Medical Records at P000027.

31.    Nurse Braun noted that motion of the shoulder or arm "aggravates pain that goes up into jaw" and that Eastman complained of pain with deep inspiration or expiration. Ex. C, Braun dep., pg. 219-220; Ex. A, Medical Records at P000027.

36.    Nurse Davis documented at 7:00 a.m. "Code 3 in House #6. [Inmate] returned to [healthcare unit] for chest pain. See protocol – EKG completed. MD notified. Orders received." Ex. B, Davis dep., pg. 298; Ex. D, Duncan dep., pg. 266; Ex. A, Medical Records at P000028.

37.    The records for Eastman show that the MD was notified and telephone orders were received. Ex. B, Davis dep., pg. 255-256, 298; Ex. A, Medical Records at P000026-27.

38.    Nurse Davis documented five orders received by telephone from Dr. Duncan: 1) Motrin 800 mg three times per day for seven days as needed; 2) chest x-ray today; 3) admit to the infirmary; 4) EKG at 8 a.m. notify MD of any change; 5) mental health referral. Ex. B, Davis dep., pg. 300-312; Ex. D, Duncan dep., pg. 61, 268-; Ex. A, Medical Records at P000028.

39.    The records indicate Dr. Duncan ordered Eastman be placed in the infirmary. Ex. B, Davis dep., pg. 296; Ex. A, Medical Records at P000026-27.

4

40.    On April 9, 2021, at approximately 8:15 a.m., a chest X-ray was completed on Eastman. Ex. E, Mansfield dep., pg. 229-230; Ex. A, Medical Records at P000029.

42.    On April 9, 2021, at approximately 10:00 a.m., Nurse Mansfield obtained another EKG. Ex. E, Mansfield dep., pg. 229; 236; Ex. A, Medical Records at P000029.

44.    On April 9, 2021, at 12:23 p.m., the EKG results were emailed to Dr. Duncan by a medical records staff member. Ex. E, Mansfield dep., pg. 279-; Ex. F, 4/9/21 Email at Bates Wexford 504-507.

46.    At 10:30 pm on April 9, 2021, Nurse Makenzie Stone documented a nursing assessment on Eastman, writing that Eastman reported he was "better than earlier," and was sitting on his bed watching television. Ex. G, Martz dep., pg. 190-191; Ex. A, medical records, at P000030.

47.    At 10:30 pm on April 9, 2021, Nurse Makenzie Stone documented Eastman had clear speech and vitals of temperature 97.9; respirations 18; heart rate 92; and blood pressure 145/81. Ex. A, medical records, at P000030.

48.    At 10:30 pm on April 9, 2021, Nurse Makenzie Stone documented Eastman reported his pain was "about a 7/8 from my chest to my jaw and right between my shoulder blades" with no pain increased with palpation. Ex. A, medical records, at P000030.

49.    Nurse Davis returned for her next shift at 11:00 p.m. on April 9, 2021, and was assigned to the infirmary. Ex. B, Davis dep., pg. 29.

50.    Nurse Davis saw Eastman at approximately 11:45 p.m. after she returned to Taylorville for her next shift. Ex. B, Davis dep., pg. 316; Ex. A, Medical Records at P000031.

5

52.     Nurse Davis took Eastman's vital signs, with a blood pressure of 138/84, pulse of 82, respiration rate of 16, temperature of 97.8 and blood oxygen saturation of 97% on room air. Ex. B, Davis dep., pg. 316-317; Ex. A, Medical Records at P000031.

53.     Other than mildly elevated blood pressure, Eastman's vitals were normal as of 11:45 pm. Ex. P, Lambert dep., pg. 141-142.

54.     Nurse Davis noted her objective assessment as "[inmate] laying in bed. Awaken [without] difficulty. Alert and oriented times three, speech clear, skin warm/dry, respiration relaxed unlabored. [heart rate] regular. Lungs clear [bilaterally] [no shortness of breath] bowel sounds present [in all four] [quadrants]. States his chest is still a little sore." Her plan was to continue the current plan of care. Ex. B, Davis dep., pg. 317-320; Ex. A, Medical Records at P000031.

56.     On the morning of April 10, 2021, Nurse Martz did a head-to-toe nursing assessment on Eastman. Ex. G, Martz dep., pg. 23, 71-72; Ex. A, medical records at P000033-34.

59.     On the morning of April 10, 2021, Eastman denied back pain to Nurse Martz and stated he talked with his mother and she had similar symptoms and it was her gallbladder and that he wanted an ultrasound. Ex. G, Martz dep., pg. 195-196; Ex. A, medical records at P000033-34.

60.     On the morning of April 10, 2021, Eastman denied nausea, vomiting, diarrhea, his lungs were clear, his respirations were easy and non-labored; he had no pain to chest his with palpation; his abdomen was soft and non-tender; he had no fever; his skin was normal, and he was alert and oriented to all spheres. Ex. G, Martz dep., pg. 195-196; Ex. A, medical records at P000033-34.

62.     On April 10, 2021, at 11 am, Nurse Martz documented that she had spoken with Dr. Duncan about Eastman. Ex. G, Martz dep., pg. 210-196; Ex. A, medical records at P000034.

6

64.     On April 10, 2021, when Nurse Martz spoke with Dr. Duncan, he told her he wanted Dr. Myers to examine Eastman prior to infirmary discharge. Ex. G, Martz dep., pg. 210-196; Ex. D, Duncan dep., pg. 69-70, 326-327; Ex. A, medical records at P000034.

68.     On April 10, 2021, at 11:50 am, Dr. Myers reviewed Eastman's recent EKGs. Ex. H, Myers dep., pg. 280-281, 290; Ex. A, medical records at P000032, 46-51.

69.     On April 10, 2021, at 11:50 am, Dr. Myers wrote an order for Tagamet three times daily for six months. Ex. H, Myers dep., pg. 280-281; Ex. A, medical records at P000032.

70.     Following seeing Eastman, Dr. Myers informed nursing staff Eastman could be discharged from the infirmary. Ex. H, Myers dep., pg. 50.

71.     On April 12, 2021, at 12:30 pm, Nurse Martz responded to a Code 3 in housing unit 6, where Mr. Eastman was found unresponsive, purple in the face, pulseless, and face down on the bathroom stall floor. Ex. G, Martz dep., pg. 28, 234; Ex. A, medical records at P000036-37.

72.     April 12, 2021, Nurse Martz directed an ambulance to be called without first calling the physician. Ex. G, Martz dep., pg. 33.

***Third Party Records***

*1.*     ▮▮▮▮▮▮▮▮

75.     ▮▮▮▮'s records show that on June 30, 2019, at 11:45 pm a code 3 was called in the housing unit on ▮▮▮▮ for complaints of chest pain/discomfort and shortness of breath. Ex. 13 to Ex. X, Kariko dep., Bates 19998-20000.

80.     The diagnosis of the emergency department was "noncardiac chest pain" and ▮▮▮▮ was back at Taylorville Correctional Center by 4:05 am. (Emphases added). Ex. Y, Bates P20191; Ex. 13 to Ex. X, Kariko dep., Bates 20003.

82.    When nursing staff found ▇▇▇ he was purple with agonal breathing and an ambulance was called. Ex. X, Kariko dep., pg. 110; Ex. 13 to Kariko dep., Bates 20020-20021.

*2.*    ▇▇▇▇▇▇

91.    ▇▇▇▇ went into cardiac arrest in the presence of EMS staff. Ex. X, Kariko dep., pg. 118; Ex. 15 to Kariko dep, Bates 19741.

*3.*    ▇▇▇▇▇

93.    The nurse note says "pt. being transported to Taylorville Memorial ER per nursing judgment." Ex. X, Kariko dep., pg. 138; Ex. 18 to Kariko dep., 12947.

94.    The medical records reflect that within around 20 minutes paramedics were present to transport ▇▇▇ to Taylorville Memorial Hospital emergency room. Ex. X, Kariko dep., pg. 138; Ex. 18 to Kariko dep., 12948.

95.    Per notification from the hospital, ▇▇▇ died on March 27, 2023. Ex. X, Kariko dep., pg. 138; Ex. 18 to Kariko dep., 12948.

*4.*    ▇▇▇▇▇

100.    The records indicate ▇▇▇'s doctor discussed ▇▇▇ with the St. Joseph ER physician, and ▇▇▇ was transferred by state car to the hospital and admitted where he was diagnosed with acute cholecystitis. Ex. X, Kariko dep., pg. 141; Ex. 19 to Kariko dep., Bates 6070-6071; Ex. 20 to Kariko dep., Bates 23775.

101.    ▇▇▇ was found unresponsive in his hospital room at 4 am on May 13, 2015, and pronounced deceased. Ex. X, Kariko dep., Ex. 19 to Kariko dep., Bates 6070-6071.

*5.*    ▇▇▇▇▇▇

103.    The medical doctor noted "see psych eval (Geodon- QT interval prolonged). Ex. Z, Bates 35025.

8

104.    The EKG notes a prolonged QT interval. Ex. Z, Bates 35070.

106.    The medical doctor ordered fasting lipid labs and a CBC and referred ▮▮▮ back to the psychiatrist. Ex. 21, to Ex. X, Kariko dep., Bates 6059; Ex. Z, Bates 35025.

111.    At the June 23, 2015, nurse practitioner encounter, ▮▮▮' vitals were normal. Ex. X, Kariko dep., pg. 146; Ex. 22 to Kariko dep., Bates 35032.

112.    According to the records ▮▮▮ told the nurse practitioner on June 23, 2015, "it happens when I eat hot sauce." Ex. X, Kariko dep., pg. 146; Ex. 22 to Kariko dep., Bates 35032.

115.    ▮▮▮ was transported to the hospital and pronounced dead in the emergency room at 9:50 am. Ex. X, Kariko dep., pg. 144; Ex. 21 to Kariko dep, Bates 6059.

*6.*    ▮▮▮▮▮▮

122.    On October 16, 2014, at 3 pm, ▮▮▮ presented to a nurse practitioner, stating "I just don't feel good. It started today. I have diarrhea, chills, body aches and headache. I feel real thirsty and my legs hurt because they are swollen." Ex. X, Kariko dep., pg. 153; Ex. 24 to Kariko dep., Bates 24163.

127.    ▮▮▮ died on October 17, 2014, at 2:20 pm at Carle Hospital in Urbana. Ex. X, Kariko dep., pg. 151; Ex. 23 to Kariko dep., Bates 6106.

II.    **Disputed Material Facts**

2.    Eastman's IDOC intake paperwork says he reported no family history of cardiac issues or hypertension. Ex. A, Medical Records, Bates P000105.

**Response:** Plaintiff does not dispute that Mr. Eastman's intake paperwork does not note a family history of hypertension, but Plaintiff disputes this statement to the extent it is intended to imply that Mr. Eastman had no documented history of elevated blood pressure or hypertension while in IDOC custody. On April 7, 2015, Mr. Eastman's blood pressure was recorded as 132/86.

9

Ex. 1 (Excerpts of Eastman's Medical Records) at P000109. On December 17, 2015, his blood pressure was recorded as 134/90. *Id.* at P000525. On April 17, 2018, during his reception intake screening at Taylorville, Mr. Eastman's blood pressure was recorded as 139/84. *Id.* at P002788. On May 15, 2019, Mr. Eastman's blood pressure was recorded as 139/91. *Id.* at P0002584. On April 13, 2020, Mr. Eastman's blood pressure was recorded as 146/88. *Id.* at P000012. On April 20, 2020, it was recorded as 190/72. *Id.* at P000014. On November 6, 2020, it was recorded as 145/94. On December 23, 2020, it was recorded as 137/94. *Id.* at P000025. Additionally, during a recorded phone call on April 9–10, 2021, Mr. Eastman stated he believed he had pre-hypertension in 2004, with a reading of 145 over 95. Ex. 2 (4.10.2021 Phone Call) at P037446. The coroner concluded that Mr. Eastman suffered from hypertensive cardiovascular disease. Ex. 1 at P000102. Dr. Kariko stated that Stage 1 hypertension is a range of 130-139/80-89. Dkt. 132 (Kariko Report) at 10.

3.      As of April 9, 2021, Eastman's medical records did not reflect he had a diagnosis of or treatment for high blood pressure. Ex. A, Medical Records, Bates P000035, 105 (intake history showing no cardiac/HTN history reported and April 12, 2021, transfer summary showing chronic conditions of Tourette's, generalized anxiety disorder, depression, and hernia).

**Response:** Plaintiff does not dispute that there is no indication in the medical records that Mr. Eastman was ever formally diagnosed with or treated for hypertension while in IDOC custody, but Plaintiff disputes this statement to the extent it is intended to imply that Mr. Eastman had no documented history of elevated blood pressure or hypertension while in IDOC custody. On April 7, 2015, Mr. Eastman's blood pressure was recorded as 132/86. Ex. 1 at P000109. On December 17, 2015, his blood pressure was recorded as 134/90. *Id.* at P000525. On April 17, 2018, during his reception intake screening at Taylorville, Mr. Eastman's blood pressure was recorded as

10

139/84. *Id.* at P002788**.** On May 15, 2019, Mr. Eastman's blood pressure was recorded as 139/91. *Id.* at P0002584. On April 13, 2020, Mr. Eastman's blood pressure was recorded as 146/88. *Id.* at P000012. On April 20, 2020, it was recorded as 190/72. *Id.* at P000014**.** On November 6, 2020, it was recorded as 145/94. On December 23, 2020, it was recorded as 137/94. *Id.* at P000025. Additionally, during a recorded phone call on April 9–10, 2021, Mr. Eastman stated he believed he had pre-hypertension in 2004, with a reading of 145 over 95. Ex. 2 at P037446. The coroner concluded that Mr. Eastman suffered from hypertensive cardiovascular disease. Ex. 1 at P000102**.** Dr. Kariko stated that Stage 1 hypertension is a range of 130-139/80-89. Dkt. 132 at 10.

6.　　　As of April 9, 2021, Eastman's medical records said he did not have a history of smoking. Ex. A, Medical Records, Bates P000105.

**Response:** Plaintiff disputes this statement. Mr. Eastman's psychiatric evaluation dated May 15, 2019 documents a history of smoking beginning at the age of 16 and ending in 2009 with his incarceration. Ex. 1 at P000984-85. Further, Plaintiff disputes this statement to the extent it attributes Plaintiff's medical history as of April 9, 2021 to the document cited, dated August 25, 2011.

9.　　　Dr. Duncan was the on-call physician at Taylorville in 2021. Ex. D, Duncan dep., pg. 121.

**Response:** Plaintiff objects to this statement because the deposition cited does not support that Defendant Duncan was the on-call physician at Taylorville for the entirety of 2021. Defendant Duncan described his role as responding to emergency calls at Taylorville, without specifying a timeframe. Dkt. 130-5 (Duncan Dep.) at 121.

13.　　　Eastman reported "my chest hurts" and said he had tightness in his chest. Ex. B, Davis dep., pg. 21; 245; Ex. A, Medical Records at P000028.

11

**Response:** Plaintiff disputes that Mr. Eastman told nursing staff "my chest hurts" and that he had tightness in his chest, in those exact words, because Defendant Davis, who filled out the Progress Note this statement refers to, testified that she could not recall Mr. Eastman's exact words. Dkt. 130-3 (Davis Dep.) at 21.

16.    Nurse Davis took Eastman to the healthcare unit for further assessment. Ex. B, Davis dep., pg. 22.

**Response:** Plaintiff does not dispute that Defendant Davis took Mr. Eastman to the healthcare unit for further assessment but clarifies that she transported him in a wheelchair. Dkt. 130-3 at 22.

20.    Eastman reported the pain had been present for about 10 to 20 minutes and started when he got up after using the restroom. Ex. B, Davis dep., pg. 250; Ex. C, Braun dep., pg. 201-202; Ex. A, Medical Records at P000026-27.

**Response:** Plaintiff does not dispute that Mr. Eastman's medical records contain the information referred to in the statement. However, Mr. Eastman reported to his mother in a phone call that the pain began at 6 am, meaning that the pain would have been present for 50 minutes by the time the note was written. Ex. 3 (4.9.2021 Phone Call) at P037423, 00:33–03:46; P037427, 11:45–11:57. Defendant Braun testified that she could not confirm that the reference to "10 to 20 minutes" was a direct quote from Mr. Eastman because she did not put quotation marks around the phrase. Dkt. 130-4 (Braun Dep.) at 201-202.

23.    Eastman did not report any recent injury or muscle strain to the chest. Ex. B, Davis dep., pg. 252; Ex. C, Braun dep., pg. 204-205; Ex. A, Medical Records at P000026-27.

**Response:** Plaintiff does not dispute that Mr. Eastman's medical records indicate "none" in response to whether he had suffered any recent injury to muscle strain to the chest. Ex. 1 at

12

P000026-27. However, Defendant Davis's cited deposition testimony does not support this statement. Dkt. 130-3 at 252:14-24 (explaining the relevance of a recent injury or muscle strain in the chest).

24.    The records indicate Eastman had or complained of dyspnea (shortness of breath), dizziness, diaphoresis (sweating) and pain in the neck/jaw. Ex. B, Davis dep., pg. 253; Ex. C, Braun dep., pg. 208; Ex. C, Braun dep., pg. 218; Ex. A, Medical Records at P000026-27.

**Response:** Plaintiff does not dispute that Mr. Eastman was experiencing the symptoms above. However, Plaintiff disputes this statement to the extent it is intended to imply that these were purely subjective complaints. Defendant Braun noted "SOB" (shortness of breath") and "diaphoretic" under the objective portion of the chest pain protocol form, indicating that she observed these symptoms. Ex. 1 at P000027; Dkt. 130-4 at 216:3-20 (Braun testifying that it was significant Mr. Eastman was short of breath and diaphoretic to explain to the doctor how he appeared); Dkt. 130-3 at 291:2-6 (Davis explaining that the objective portion of the form contains "what you see").

26.    The nurses pulled the Medication Administration Record ("MAR") and reviewed it as part of the nursing assessment of Eastman. Ex. C, Braun dep., pg. 210-211.

**Response:** Plaintiff disputes this statement because the cited material does not support it. Defendant Braun testified that she had no independent recollection of her encounters involving Mr. Eastman. Dkt. 130-4 at 16:4-6 (when asked if she had any independent recollection of any interactions with Mr. Eastman, Braun responded, "No."). Defendant Braun testified that she knew Defendant Davis pulled Mr. Eastman's MAR "[b]ecause we always pull their MAR" but stated that she "couldn't recall" reviewing it. Dkt. 130-4 at 210:17-25.

13

27.    Eastman's vital signs were reported as temperature 97.8, pulse 88, respiration rate 24, blood oxygen 99% on room air. These are all within acceptable limits. Ex. B, Davis dep., pg. 283-285; Ex. C, Braun dep., pg. 215; Ex. A, Medical Records at P000027.

**Response:** Plaintiff does not dispute that Mr. Eastman's vital signs were recorded as noted above on April 9, 2021 at 6:52 am but disputes the characterization that they were "within acceptable limits." Defendant Davis conceded that Mr. Eastman's respiration rate of 24 was "a little high." Dkt. 130-3 at 284:16-19. Plaintiff's nursing expert, Johnnie Lambert, opined that Mr. Eastman's respiration rate was abnormal. Dkt. 130-15 (Lambert Report) at 7.

28.    Eastman's initial blood pressure reading was 160/105 but 146/93 when rechecked. Both are elevated and were relayed to Dr. Duncan. Ex. B, Davis dep., pg. 286; Ex. C, Braun dep., pg. 218; Ex. A, Medical Records at P000027.

**Response:** This sentence fragment is incomplete. Plaintiff does not dispute that Mr. Eastman's initial blood pressure reading was recorded as 160/105 on April 9, 2021 at 6:52 am. Ex. 1 at P000027. There is no indication in the medical records how much time elapsed between the first blood pressure reading and the re-check that was recorded as 146/93. *Id.* at P000027; Dkt. 130-4 at 218 (testifying that she did not record a time for the re-check so there is no way of knowing how much time elapsed between the two readings).

32.    Nurse Davis and Nurse Braun completed an EKG on Eastman. Ex. B, Davis dep., pg. 297; Ex. C, Braun dep., pg. 231; Medical Records at P000028.

**Response:** Plaintiff objects to this statement because the sources cited do not support it. The citation to Defendant Davis's testimony only confirms that an EKG was completed, not that she or Defendant Braun were the ones to complete it. Dkt. 130-3 at 297:23-25. The citation to

14

Defendant Braun's testimony confirms that she was only present when one of the EKGs conducted on Mr. Eastman. Dkt. 130-4 at 231.

33.    Nurse Davis called Dr. Duncan and read him the nursing protocol sheet filled on assessing Eastman and told him Eastman's vitals. Ex. B, Davis dep., pg. 298-299; Ex. D, Duncan dep., pg. 249-254, 258, 262; Ex. A, Medical Records at P000028.

**Response:** Plaintiff objects to this statement because it purports to represent Defendant Davis's exact conversation with Defendant Duncan, despite the fact that Defendant Davis testified that she could not recall the whole conversation. *See* Dkt. 130-3 at 299:13-16 ("I don't remember the whole conversation. All I know is that he gave me the orders.").

34.    Nurse Davis read the computer-generated findings from the 7:00 a.m. EKG to Dr. Duncan on the phone. Ex. B, Davis dep., pg. 311-312.

**Response:** Plaintiff disputes this statement to the extent it suggests that Defendant Davis read the EKG in its entirety to Defendant Duncan, rather than reading only the machine-generated diagnosis. Dkt. 130-3 at 311:14-312:10 (testifying that "[w]e are not trained to read EKGs, so we read what the diagnosis that our machine is designed to do").

35.    Nurse Davis read the "interpretation" portion of the EKG to Dr. Duncan, which states: "12SL – Interpretation: Normal sinus rhythm, nonspecific T wave abnormality, Abnormal EKG." Ex. B, Davis dep., pg. 327-328; Ex. D, Duncan dep., pg. 294; Ex. A, Medical Records at P000046.

**Response:** Plaintiff disputes the accuracy of this citation. The medical record referenced notes "ECG," not EKG. Ex. 1 at P000004.

41.    On April 9, 2021, Mansfield encountered Eastman in the healthcare unit. Ex. E, Mansfield dep., pg. 225; Ex. A, Medical Records at P000029.

15

**Response:** Plaintiff disputes this statement as misleading. There are three nursing notes by Defendant Mansfield on April 9 at 10 a.m., 12:10 p.m. and 2:30 p.m. Ex. 1 at P000029. Defendant Mansfield encountered Mr. Eastman at 10 a.m. to conduct an EKG but did not document any subjective or objective findings. *Id.* at P000029. Defendant Mansfield does not know one way or the other whether she interacted with Mr. Eastman face-to-face at 12:10 p.m., and she testified that she did not interact with him face-to-face at 2:30 p.m. Dkt. 130-6 at 232:19-233:19; 242:22-243:13.

43.    On April 9, 2021, at approximately 12:10 p.m., Nurse Mansfield spoke with Dr. Duncan regarding Eastman and received a telephone order from Dr. Duncan for an additional EKG and that the results of all three EKGs be emailed to him. Ex. E, Mansfield dep., pg. 232-235; Ex. D, Duncan dep., pg. 64, 299-300; Ex. A, Medical Records at P000029.

**Response:** Plaintiff objects to this statement because there is no evidence that Defendant Mansfield discussed anything with Defendant Duncan regarding Mr. Eastman other than the EKG reports. Ex. 1 at P000029; Dkt. 130-6 (Mansfield Dep.) at 232:19-235. Defendant Mansfield testified that her typical practice in conducting an assessment is to document it in a progress note and record everything she observes. Dkt. 130-6 at 67:17-19; 68:8-11. During Mansfield's entire 7 a.m.- 3 p.m. shift on April, while Mr. Eastman was in the infirmary for chest pain, his vitals were not taken, and no subjective or objective information about him was documented. Ex. 1 at P000029-30. There is no evidence that Mansfield observed or asked Mr. Eastman about his condition, or that she relayed any such information to Defendant Duncan.

45.    On April 9, 2021, at approximately 2:30 p.m., Dr. Duncan called Taylorville and spoke with Nurse Mansfield, giving telephone orders for an additional EKG to be done at 6:00

p.m. and another at 8:00 a.m. on April 10, 2021. Ex. E, Mansfield dep., pg. 242-246; Ex. A, Medical Records at P000029.

**Response:** Plaintiff disputes that Defendant Duncan called Taylorville to speak with Defendant Mansfield. Defendant Mansfield did not have an independent recollection of any of their conversations on April 9 and assumed that Defendant Duncan called her based on the language of the progress note. Dkt. 130-6 at 245:2-246:24. Plaintiff additionally disputes this statement to the extent it suggests that a 6pm or 8am EKG occurred, given that they did not occur. Ex. 1 at P000030-51; Dkt. 130-5 at 360:22-24.

51.     At 11:45 p.m., Nurse Davis documented Eastman's subjective complaint, quoting him as saying "I'm doing better. My chest is still a little sore." Ex. B, Davis dep., pg. 314-315, 322; Ex. A, Medical Records at P000031.

**Response:** Plaintiff disputes the accuracy of this statement because Defendant Davis did not document Mr. Eastman's pain scale rating. Ex. 1 at P000031. Additionally, following his discharge on April 10, Mr. Eastman called his mother at 12:25 p.m. and told her that he was still in pain more than 24 hours later, that he felt the pain in his throat, and that he could not sleep the previous night because he was in so much pain. Ex. 4 (4.10.2021 Phone Call) at P037394–P037396, 01:35–03:22.

55.     Nurse Davis check Eastman's lungs, heart rate and bowel sounds by listening with a stethoscope. Ex. B, Davis dep., pg. 318; Ex. A, Medical Records at P000031.

**Response:** Plaintiff objects to this statement because it is not supported by the exhibits cited. Although Defendant Davis's progress note records that Mr. Eastman's heart rate was regular, his lungs were clear, and bowel sounds were present, Defendant Davis did not have an independent recollection of this assessment. Dkt. 130-3 at 320:5-10 (when asked if she had an independent

17

recollection of the assessment, Davis stated, "I did not chart, so I guess not. I don't have an independent recollection.").

57.    On the morning of April 10, 2021, Nurse Martz took Eastman's vital signs, noting them to be temperature of 97.8, blood pressure, 194/95, respiratory rate 16. Ex. G, Martz dep., pg. 195-196; Ex. A, medical records at P000033-34.

**Response:** Plaintiff disputes this statement as inaccurate. Defendant Martz recorded Mr. Eastman's temperature as 97.9. Ex. 1 at P000034**.** This statement also omits that Defendant Martz recorded Mr. Eastman's heart rate as 95 beats per minute. *Id.*; Dkt. 130-8 (Martz Dep.) at 196:7-13. Plaintiff additionally disputes this statement as inaccurate because Defendant Martz recorded Mr. Eastman's blood pressure as 149/95.  Ex. 1 at P000034.

58.    On the morning of April 10, 2021, Nurse Martz observed that Eastman was resting in bed with his eyes closed, awakened easily, and reported he was feeling much better and. complained of some pain and upper chest radiating to throat but mostly resolved. Ex. G, Martz dep., pg. 195-196; Ex. A, medical records at P000033-34.

**Response:** Plaintiff does not dispute that Defendant Martz recorded that Mr. Eastman was resting in bed with his eyes closed, awakened easily, and stated he was feeling much better. However, Plaintiff disputes the statement "complained of some pain and upper chest" as inaccurate. Defendant Martz recorded that Mr. Eastman still complains of some pain *in* upper chest radiating to throat. Ex. 1 at P000033-34 (emphasis added). Plaintiff further disputes the characterization that Mr. Eastman's pain was "mostly resolved." On April 10 at 12:25 pm, Mr. Eastman told his mother in a phone call that he still felt the pain "over 24 hours later" and that he could not sleep the previous night because he was in so much pain. Ex. 4 at P037394–P037395, 01:35–03:22. In another phone call to his mother that day at 4:42 pm, Mr. Eastman told her that

18

his chest, back, and head hurt and that the pain "is not going away." Ex. 5 (4.10.2021 Phone Call) at P037357–P037358, 01:00–01:48. Mr. Eastman told his sister in a phone call at 3:40 pm that the pain had been "steady" for a day and a half now, that he had tightness in his chest as he spoke to her, and that the pain was so acute the previous night that he was "thrashing around." Ex. 2 at P037444, P037448, 01:10–01:17, 15:07. In a phone call to his brother at 6:13 pm, Mr. Eastman stated that the Naproxen was not helping, that he was still in pain, and that his chest hurt to his ear canal. Ex. 6 (4.10.2021 Phone Call) at P037384-85, 01:40–01:53.

61.    On the morning of April 10, 2021, Nurse Martz assessed chest pain and documented she would talk with Dr. Duncan regarding further testing v. discharge from infirmary. Ex. G, Martz dep., pg. 195-196; Ex. A, medical records at P000033-34.

**Response:** Plaintiff objects to this statement because it is an incomplete fragment. Further, Plaintiff disputes this statement to the extent it suggests that Defendant Martz conducted a complete chest pain assessment. Defendant Martz did not record a pain scale rating. Ex. 1 at P000033-34. Defendant Martz knew that assessing the cardiac system included documenting pulse. Dkt. 130-8 at 72:1-5.

63.    On April 10, 2021, when Nurse Martz spoke with Dr. Duncan, she relayed her assessment of Eastman from earlier that morning to Dr. Duncan. Ex. G, Martz dep., pg. 213-214; Ex. D, Duncan dep., pg. 69, 326.

**Response:** Plaintiff objects to this statement because it is not supported by the exhibits cited. Defendant Martz did not have an independent recollection of this conversation. Dkt. 130-8 at 213:2-7; 214:17-19. Defendant Duncan did not recall anything about his conversation with Martz beyond her relaying that there was a doctor on site, whom Duncan instructed her to have

19

examine Mr. Eastman prior to his discharge. Dkt. 130-5 at 327:20-328:3. Duncan did not recall receiving any information about Mr. Eastman's condition during his phone call with Martz. *Id.*

65.    On April 10, 2021, at 11:50 am, Dr. Myers saw Eastman because nursing staff asked him to evaluate Eastman for discharge from the infirmary. Ex. H, Myers dep., pg. 47.

**Response:** Plaintiff disputes to the extent it implies that Defendant Myers examined Mr. Eastman. Defendant Myers did not conduct a physical examination of Mr. Eastman because he did not think it was necessary. Dkt. 130-9 at 284:2-5.

66.    On April 10, 2021, at 11:50 am, Eastman reported to Dr. Myers he had "no pain now," reported that "he was taking Tums like candy," and questioned if it was a gallbladder attack. Ex. H, Myers dep., pg. 280; Ex. A, medical records at P000032.

**Response:** Plaintiff does not dispute that Dr. Myers recorded that Mr. Eastman had "no pain now," "reported that he was taking Tums like candy," and questioned if he was having a gallbladder attack. Ex. 1 at P000032. However, Plaintiff disputes that Mr. Eastman stated he was in "no pain now," given the inconsistent evidence in the record. In phone calls shortly after his discharge from the infirmary on April 10, Mr. Eastman reported that he was in ongoing severe pain. At 12:25 pm, Mr. Eastman told his mother that he was still in pain 24 hours later and that he "couldn't sleep yesterday or last night because it hurt so bad." Ex. 4  at P037394–P037396, 01:35–03:22. At 3:40 pm, he told his sister in a phone call, "Right now, there's a tightness in my chest right now as I'm speaking to you. It just hasn't gone away. It won't go away." Ex. 2 at P037444-45. Further, Dr. Kariko opined that it was unclear why Mr. Eastman was taking Tums "like candy" if he was not continuing to experience discomfort. Dkt. 132 at 13.

20

67.     On April 10, 2021, at 11:50 am, Dr. Myers discussed Eastman's symptoms with Eastman and that they did not appear to be related to a gallbladder attack and instead were secondary to his history of reflux. Ex. H, Myers dep., pg. 280; Ex. A, medical records at P000032.

**Response:** Plaintiff disputes this statement to the extent it is intended to assert that Mr. Eastman had a history of reflux, given that there is no documented history of reflux in his medical records. Ex. 1 at P001182.

73.     Mr. Eastman was declared deceased as of 12:49 pm. Ex. G, Martz dep., pg. 234; Ex. A, medical records at P000036-37.

**Response:** Plaintiff disputes the time of death, given that it is noted as 12:48 pm. Dkt. 130-8 at 234; Ex. 1 at P000036-37.

74.     Eastman's cause of death was hemopericardium due to or as a consequence of ruptured ascending aortic dissection. Ex. A, medical records at P000103.

**Response:** Plaintiff does not dispute that the coroner concluded Mr. Eastman's immediate cause of death was hemopericardium due to or as a consequence of ruptured ascending aortic dissection. However, the coroner also noted hypertensive cardiovascular disease as another significant condition contributing to death. Ex. 1 at P000103.

***Third Party Records***

1.     ███████████

76.     Nursing staff called Dr. Nawoor who directed the patient admitted to the infirmary for 23-hour observation, labs drawn, and to call him if the pain persisted. Dkt Ex. 13 to Ex. X, Kariko dep., Bates 20000.

21

**RESPONSE:** Plaintiff does not dispute this statement, but objects to clarify that the labs drawn were: D-Dimer, "sed rate", CBC, CRP, and cardiac enzymes. Ex. 7 (Excerpts of ██ Records) at P020003.

77.    At 1 am, ██ reported his pain was worsening, nursing staff called Dr. Nawoor, who ordered ██ transported to the ER for evaluation. Ex. 13 to Ex. X, Kariko dep., Bates 20003.

**RESPONSE:** Plaintiff does not dispute this statement but objects to clarify that it took 45 minutes from the time of his complaint to the time the ambulance was on the grounds and left with ██ Ex. 7 at  P020003.

79.    All testing at the emergency department was found unremarkable. Ex. Y, Bates P20191.

**RESPONSE:** Plaintiff disputes this fact because the cited document says "Lab unremarkable" and it is not clear which lab or labs that refers to and does not establish that "[a]ll testing was unremarkable.". Ex. 7 at P020191.

81.    Nine months later, on March 9, 2020, at 5 pm a code 3 was called regarding ██ and responding nursing staff found ██ lying on the floor as if he had fallen off the toilet with blood coming from a laceration on his head. Ex. X, Kariko dep., pg. 109; Ex. 13 to Kariko dep., Bates 20020-20021.

**RESPONSE:** Plaintiff disputes this statement because, apart from the date and time listed above, Defendant's factual assertions are not supported by the record citations provided.

83.    ██ died March 9, 2020. Ex. X, Kariko dep., pg. 109.

**RESPONSE:** Plaintiff disputes this statement because Defendant does not provide record support for it; the citation is not correct.

22

84.     ████ did not present to medical staff with acute cardiac symptoms in the months leading up to his death. Ex. X, Kariko dep., pg. 111.

**RESPONSE:** Plaintiff disputes this statement because medical staff stopped monitoring his cardiac health in October 2019 despite his known history of coronary artery disease, angioplasty, stents, and hyperlipidemia.  Ex. 7 at P020278-79, P019993.

*2.     ███████████*

85.     ██████'s records show that on January 28, 2016, at 4:30 am he presented to nursing staff with complaints of experiencing chest pain for the last four and a half hours he described as 4/10 in severity. Ex. X, Kariko dep., pg. 115-116; Ex. 15 to Kariko dep, Bates 19734-19735.

**Response:** Plaintiff disputes this fact to the extent it is incomplete and misleading since it omits that ███ also presented with an elevated blood pressure. Ex. 8 (Excerpts of ███ Records) at P019735.

86.     At the time he saw a nurse on January 28, 2016, ██████ reported he no longer had pain, describing pain as "0." Ex. X, Kariko dep., pg. 116; Ex. 15 to Kariko dep, Bates 19734.

**Response:** Plaintiff disputes that he no longer had pain because the note says that his pain was a 4 (out of 10) when laying down, and that "currently pain is 0." It is not clear whether he was laying down while he was being questioned, but the note does not say that he "no longer had pain." Ex. 8 at P019734.

87.     Nursing staff called the physician and received orders. Ex. 15 to Ex. X, Kariko dep., Bates 19734-19735.

**Response**: This is disputed because the citations do not support the statement. It is not clear what mode of communication was used to communicate with the doctor. The direction on the

23

nursing chest pain protocol reading "MD Referral for all cases, call on-call MD if not on-site for directions in all cases" is circled, and under "further orders as per MD" there is a written note saying "I/M scheduled for MDSC [MD sick call] today per Dr. Nawoor." It implies there was communication, but that is not explicit since neither the mode of communication nor the conversation was documented. Ex. 8 at P019734-35.

88.    The physician saw ███████ several hours later at 9 am, noting the EKG showed no acute changes. Ex. X, Kariko dep., pg. 116-117; Ex. 15 to Kariko dep, Bates 19733.

RESPONSE: It is not disputed that the physician saw ████ at 9am or that he noted the EKG showed no acute changes, but the fact is disputed because the results of the EKG are not provided, and it is not noted what changes, even if not acute, may have been present, or whether it was an abnormal or borderline EKG. Ex. 8 at P019733.

89.    ████████ did not present to medical staff again until 3:10 am on March 6, 2016, when he had sudden onset shortness of breath and low oxygen levels. Ex. X, Kariko dep., pg. 117; Ex. 15 to Kariko dep, Bates 19738-41.

RESPONSE: Plaintiff does not dispute the note is dated March 6, 2016, but objects because ████. died on March 5, so it is presumed that March 6 was written in error. Plaintiff further objects because this statement is misleading and leaves information out. Furthermore, the note indicates, and Dr. Kariko's testimony confirms, that ████. also presented with an elevated pulse and elevated respirations, and no blood pressure was taken. Dkt. 139-1 (Kariko Dep.) at 117, Ex. 8 at P019738-41.

90.    The doctor gave orders to administer Lasix and when ████████'s oxygenation dropped into the 60's the physician gave an order to send to the hospital via ambulance. Ex. X, Kariko dep., pg. 117-118; Ex. 15 to Kariko dep, Bates 19738-41.

24

**RESPONSE:** Plaintiff does not dispute this that the doctor ordered Lasix and then ordered ▮ to be sent to the hospital once his oxygenation dropped into the 60s, but Plaintiff disputes it to the extent it implies that giving ▮ Lasix was appropriate. Dr. Kariko opined that it was inappropriate to order Lasix without having ▮'s full vital signs. Dkt. 139-1 at 120:4-11.

*3.* ▮▮▮▮▮

92. ▮▮▮'s records show that on March 27, 2023, ▮▮▮ presented to a nurse with chest pain going up into his right shoulder, with low blood pressure and fast respirations looking pale, and having just vomited. Ex. X, Kariko dep., pg. 137-138; Ex. 18 to Kariko dep., Bates 12947.

**RESPONSE:** Plaintiff disputes this statement to the extent it leaves out that his blood sugar was 390. Ex. 9 (Excerpts of ▮. Records) at P012947.

96. There are no medical records for ▮▮▮ reflecting encounters where he made complaints of symptoms, including chest pain in March 2023. Ex. X, Kariko dep., pg. 139; Ex. 18 to Kariko dep., 12943-12948 (reflecting progress notes from March 1, 2023, to date of death of March 23, 2023).

**RESPONSE:** Plaintiff disputes that ▮ did not have any encounters reflecting complaints of chest pain in March 2023. P012945 reflects a "Health Status Transfer Summary" from March 21, 2023 that lists "chest pain" next to "current treatments." This document also notes that he has hypertension, diabetes, migraines, and GERD but also lists that he is hypotensive. Ex. 9 at P012945. He also reports "I have chest pain going up through my right shoulder" and is assessed to have chest pain on his March 21, 2023 progress note. Ex. 9 at P012947.

*4.* ▮▮▮▮

97.      █████'s records show that on the morning of May 11, 2015, █████ gave a history of having abdominal pain for about one day with two episodes of vomiting the night before and denied cardiac symptoms. Ex. X, Kariko dep., pg. 141; Ex. 19 to Kariko dep., Bates 6070-6071; Ex. 20 to Kariko dep., Bates 23772.

**RESPONSE**: Plaintiff disputes that he had no cardiac symptoms because he presented with an elevated blood pressure of 144/96  at 8:45 am and no respiration rate was documented, and at 3:50pm he had an elevated heart rate documented as 120. Ex. 10 (Excerpts of █████ Records) at P023771.

98.      █████'s physical examination showed mild tenderness in the epigastric abdomen and the physician ordered labs and abdominal X-ray. Ex. X, Kariko dep., pg. 141; Ex. 19 to Kariko dep., Bates 6070-6071; Ex. 20 to Kariko dep., Bates 23772.

**RESPONSE:** Plaintiff disputes this statement to the extent it implies a physician examined █████ The record does not indicate if a doctor examined him. The top of the note on P023772 says "RN note" and the signature is illegible. Ex. 10 at P023772.

99.      The following day May 12, 2015, at 8:20 am, the doctor noted █████'s abdominal pain shifted to the upper and lower quadrants of the right side of the abdomen. Ex. X, Kariko dep., pg. 141; Ex. 19 to Kariko dep., Bates 6070-6071; Ex. 20 to Kariko dep., Bates 23775.

**RESPONSE**: Plaintiff disputes this statement to the extent it implies that the pain shifted on May 12. █████ was not examined since 3:50pm on May 11, thus it is not known when the shift happened or how his symptoms changed between 3:50pm on May 11 and 8:00am on May 12. Ex. 10 at P023772-75.

*5.*      █████████

26

102.    ███████' records show that on March 16, 2015, ███████ saw the facility medical director due to an abnormal EKG, after the psychiatrist had ordered it as a routine workup for psychiatric medications. Ex. 21, to Ex. X, Kariko dep., Bates 6059; Ex. Z, Bates 35025.

**RESPONSE:** This is disputed because the records do not indicate that he was seen by the facility medical director. Ex. 11 (Excerpts of ███ Records) at  Wexford Bates 6059, P035025.

105.    Geodon can cause EKG changes. Ex. 21, to Ex. X, Kariko dep., Bates 6059.

**RESPONSE:** Plaintiff disputes this to the extent it is intended to imply that Geodon causes the changes that ███.'s EKG showed, since that is not what the Bates 6059 says. The record says Geodon can cause "some EKG changes," but does not say which changes it can cause or whether ███'s changes were consistent with the changes Geodon can cause. Ex. 11 at Wexford Bates 6059.

107.    The medical doctor saw ███████ again on March 30, 2015, for increased cholesterol and at this visit ██████ gave no history of chest pain. Ex. 21, to Ex. X, Kariko dep., Bates 6059; Ex. Z, Bates 35026.

**RESPONSE:** Plaintiff disputes this fact because the doctor's handwriting on his March 30th note is illegible, so it is unclear what was noted or ordered. From what Plaintiff can see, this doctor did not examine or question the patient about his cardiac health, despite his recent abnormal EKG and the fact that he was there for a high cholesterol evaluation. Ex. 11 at P035026. Plaintiff further disputes this fact to the extent it implies that the doctor examined the patient, since no note of an examination is present. *Id.*

108.    On June 13, 2015, ██████ presented to nursing staff with a complaint of burning in his throat for a month that he said was related to eating. Ex. X, Kariko dep., pg. 145; Ex. 22 to Kariko dep., Bates 35029.

27

**RESPONSE:** Plaintiff disputes this fact to the extent that it is incomplete: the nurse did not elevate this issue to a provider, and he reported his pain as a 5 out of 10. Ex. 11 at P035029.

109. On June 19, 2015, ███ presented to nursing staff with a complaint of burning in his throat for a month and reported Zantac had helped in the past. Ex. X, Kariko dep., pg. 145; Ex. 22 to Kariko dep., Bates 35030.

**RESPONSE:** Plaintiff disputes this fact to the extent that it is incomplete: he reported his pain increased to a 6 out of 10. Ex. 11 at P035030

110. ███ saw a nurse practitioner on June 23, 2015, on a referral from nursing staff for heartburn. Ex. X, Kariko dep., pg. 146; Ex. 22 to Kariko dep., Bates 35032.

**RESPONSE:** Plaintiff disputes this fact to the extent that it implies that the nurse practitioner examined him; there is no examination documented. Ex. 11 at P035032.

113. On June 23, 2015, the nurse practitioner assessed gastroesophageal reflux disorder (GERD) and ordered labs of H. pylori and CBC, Zantac medication, and advised ███ to avoid hot sauce. Ex. X, Kariko dep., pg. 146; Ex. 22 to Kariko dep., Bates 35032.

**RESPONSE:** Plaintiff disputes this fact to the extent that it implies that the nurse practitioner examined him; there is no examination documented. Ex. 11 at P035032.

114. Three days later, on June 25, 2015, at 8:57 am, nursing staff responded to a Code 3 and found ███ unresponsive. Ex. X, Kariko dep., pg. 149; Ex. 22 to Kariko dep., Bates 35033-34.

**RESPONSE:** Plaintiff disputes this fact to the extent that it is incomplete: he was found unresponsive with a "baseball size amount of blood" on the floor next to him. Ex. 11 at P035033.

116. The Wexford Death Summary lists ███' cause of death as "unknown." Ex. 21 to Kariko dep, Bates 6059.

28

**RESPONSE**: Plaintiff does not dispute the Wexford Death Summary lists ██'s cause of death as unknown, but Plaintiff disputes the statement because its substance is false. ██'s cause of death is not unknown. The record indicates that his cause of death was acute myocardial infarction due to severe coronary artery narrowing due to atherosclerotic cardiovascular disease. Ex. 11 at P004782.

*6.* ████████

117.   ████s records show that ████ had end-stage decompensated liver cirrhosis with encephalopathy and ascites. Ex. X, Kariko dep., pg. 152; Ex. 23 to Kariko dep., Bates 6106.

**RESPONSE**: This is disputed because Bates 6106 does not indicate that ██'s decompensated liver cirrhosis was end-stage, and the citation to Dr. Kariko's deposition does not make that fact firm either, she could only confirm based on what she was shown that it "looks like" it. Ex. 12 (Excerpts of ██ Records) at Wexford Bates 6106; Dkt. 139-1. at 152.

118.   ████ had become encephalopathic (altered mental status from liver failure) on March 4, 2014, and was sent to the hospital, returned to the prison, and then admitted to the hospital from March 7 to March 12. Ex. 23 to Ex. X, Kariko dep., Bates 6106.

**RESPONSE**: Plaintiff does not dispute that ██ was encephalopathic but disputes the parenthetical definition of "altered mental status from liver failure" since that is not supported by the citation and the cause of this encephalopathy is not stated. Ex. 12 at Bates 6016. Additionally, Plaintiff disputes to the extent this statement is incomplete. His March 7 hospital admission was triggered from blood in his stool and vomiting. *Id.*

119.   Following recurrent blood in stool, vomiting, ascites, and episodes of encephalopathy, he was admitted to the hospital again from March 16 to March 25, 2014. Ex. 23 to Ex. X, Kariko dep., Bates 6106.

29

**RESPONSE:** Plaintiff disputes this to the extent the underlying medical records are not cited here to confirm the timing or completeness of the symptoms/medical events to which this fact refers, and the document that is cited, Wexford's death summary of ███, only states this in summary fashion, so it is unclear what details may be omitted. at Ex. 12 at Bates 6016.

120. Carle Hospital discharged ███ with diagnoses of acute encephalopathy, decompensated liver cirrhosis with esophageal and gastric varices, hyperbilirubinemia and coagulopathy, acute kidney injury, hyperkalemia, and nongap metabolic acidosis. Ex. 23 to Ex. X, Kariko dep., Bates 6106.

**RESPONSE:** Plaintiff disputes this to the extent the underlying medical records are not cited here to confirm the timing or completeness of the events that are referred to and that are only stated in summary fashion in Wexford's death summary of ███. Ex. 12 at Bates 6106.

121. ███ then underwent a series of esophageal and gastric ligations/bandings with the last one done October 9, 2014. Ex. 23 to Ex. X, Kariko dep., Bates 6106.

**RESPONSE:** Plaintiff disputes this to the extent the underlying medical records are not cited here to confirm the timing or completeness of the events that are referred to here and they are only stated in summary fashion in Wexford's death summary of ███ Ex. 12 at Bates 6106.

123. The nurse practitioner noted ███ was ill appearing, had labored respiration, tachycardia, low grade fever, and bilateral pitting edema. Ex. X, Kariko dep., pg. 153; Ex. 24 to Kariko dep., Bates 24163.

**RESPONSE**: Plaintiff disputes this fact to the extent it implies the nurse practitioner examined ███ The record does not indicate an examination was conducted. Ex. 12 at P024165.

124. The nurse practitioner admitted ███ to the infirmary and ordered Lasix, Tylenol, and labs. Ex. X, Kariko dep., pg. 153; Ex. 24 to Kariko dep., Bates 24163.

30

**RESPONSE**: Plaintiff disputes this fact to the extent it implies the nurse practitioner examined ███. The record does not indicate an examination was conducted. Ex. 12 at P024165.

125.    At 5:40 pm on October 16, 2014, ███ reported vomiting blood. Ex. X, Kariko dep., pg. 154 (deposition misstated time as 6:40 pm); Ex. 24 to Kariko dep., Bates 24171.

**RESPONSE**: Plaintiff disputes this fact because the record appears to state 6:40pm. Plaintiff further disputes this statement because it is incomplete. The record indicates he threw up blood, was dizzy, had abnormal vital signs including low blood pressure, low pulse, and high respirations, and the LPN's response to his presentation was to have an RN help assess him. Ex. 12 at P024171.

126.    According to the nursing note, a call was placed to the physician at 5:50 pm and orders were received to send ███ to the hospital by ambulance STAT. Ex. X, Kariko dep., pg. 153; Ex. 24 to Kariko dep., Bates 24172.

**RESPONSE:** Plaintiff disputes this statement because the nursing note is written at 1925 (7:25pm).  Ex. 12 at P024172. It does state that a call was placed to the doctor at 1750 (5:50pm) but the nursing does not indicate it was a late entry so it is unclear which, if any, times were inaccurately documented. *Id.* Additionally, although the order was to send him to the hospital STAT, the ambulance left at 1835 (6:35pm). *Id.*  If the doctor gave the order at 5:50pm, it was 45 minutes until ███ was taken to the hospital. *Id.*

III.    **Undisputed Immaterial Facts**

7.    As of April 9, 2021, Eastman had a history of anxiety disorder. Ex. D, Duncan dep., pg. 61; Ex. I, Mental Health Record, Bates P000035 (April 12, 2021, transfer summary indicating GAD or generalized anxiety disorder); P0001313.

31

**Response:** This fact is immaterial because a history of anxiety disorder is irrelevant to whether Defendants violated constitutional and state law by failing to transfer Mr. Eastman to the ER, or to otherwise seek appropriate medical treatment for Mr. Eastman. Plaintiff does not dispute that Mr. Eastman had a history of anxiety.

78.    The Taylorville Hospital Emergency Department ran blood work, did a chest X-ray, and EKG study, *and did not perform a CT*. Ex. Y, Bates P20191.

**RESPONSE**: Plaintiff does not dispute this statement but notes that it is immaterial that a CT was not performed since ██████'s symptoms did not include stabbing chest pain radiating up to the neck and jawbone like Mr. Eastman's did, nor did ██████ have abnormal vital signs like Mr. Eastman did. Ex. 7 at P020003; Ex. 1 at P000026.

### PLAINTIFF'S ADDITIONAL MATERIAL FACTS

Plaintiff expressly incorporates her Statements of Additional Material Facts filed in response to the Physician and Nursing Defendants' Motions for Summary Judgment, at Dkt. 149.[2]

**Third Parties**

1.    Plaintiff's correctional medical expert, Dr. Kariko, MD, reviewed third-party medical records of (1) individuals who died at Taylorville Correctional Center from cardiac-related issues between 2016 and 2023; (2) 30- to 50-year-old individuals who died in IDOC custody from cardiac-related issues between 2014 to 2023; and (3) individuals who died at Taylorville Correctional Center from any cause between 2015 and 2022. Dkt. 132 at 39.

---

[2] Facts incorporated from Plaintiff's Statements of Additional Material Facts filed in response to the Physician and Nursing Defendants' Motions for Summary Judgment at Dkt. 149 will be cited in this argument as Plaintiff's Statement of Facts ("PSOF"). Facts stated in this response will be cited as Plaintiff's Statement of Facts - Wexford ("PSOFW").

██

2.    On March 17, 2021 at 2:15pm, ██ presented to nursing staff with shortness of breath and life-threatening vital signs, including a pulse rate of 133, falling oxygen levels, audible wheezing, and a known history of lung and heart failure. He was assessed by a nurse using the shortness of breath nursing protocol, given an inhaler, and instructed to follow up as needed. Ex. 13 (Excerpts of ██ Records) at P025323-4.

3.    No provider was notified. Ex. 13 at P025323-4.

4.    On March 18 at 7:00pm, he pushed the call light because of shortness of breath, respiratory distress, labored breathing, diaphoresis, inability to speak, skin pale, diminished lung sounds, chest pain and tightness. Ex. 13 at P025324.

5.    He was sent by ambulance to the hospital. Ex. 13 at P025324.

6.    By the time ██ arrived at the hospital, he was in critical condition and required ICU-level care. Dkt 132 at 40.

7.    By 11:30pm, the healthcare unit was notified of his death. Ex. 13 at P025324.

8.    His cause of death was cardiac arrhythmia due to left ventricular hypertrophy with significant contributing conditions of heart failure and sarcoidosis. Ex. 13 at P025271.

9.    He was 36 years old. Ex. 13 at P025264.

██

10.    On March 22, 2016, ██. notified a correctional officer that he was short of breath. Ex. 14 (Excerpts of ██ Records) at P024981.

11.    A certified medical technician ("CMT") was called to check on ██ in his cell at 10:15am, during which he reported that he got short of breath while washing up and that he was a dialysis patient. *Id.*

12.    ██. said he would come down to sick call to see the CMT. *Id.*

33

13.    By 10:26am, ██. had not made it to sick call, so the CMT went back to see him and ██ reported that it was still hard to breathe. *Id.*

14.    The CMT took his vitals which included an elevated blood pressure, elevated pulse rate, and elevated respiratory rate. *Id.*

15.    ██. was brought to the healthcare unit via wheelchair. *Id.*

16.    He arrived to the healthcare unit at 10:32am; he was hypoxic, had a fast heart rate, high respirations, and high blood pressure. Ex. 14 at P024983.

17.    He was given epinephrine at 10:37, and by 10:40am, an ambulance was called and CPR started. Ex. 14 at P024983.

18.    ██. died March 22, 2016 of hypertensive cardiovascular disease at 39 years old. Ex. 14 at P024871, P024881.

19.    Plaintiff's medical expert, Dr. Kariko, opined that it was not appropriate for healthcare staff to leave him in his cell after his 10:15 complaint, knowing he was short of breath and a dialysis patient. Dkt. 139-1 at 104.

20.    ██'s high blood pressure was inadequately treated, resulting in dangerously elevated, life-threatening blood pressure. He also had dangerously high potassium levels that should have prompted transfer to the hospital. Dkt. 132 at 40.

██

21.    During a mental health evaluation on October 28, 2019, 38-year-old ██ reported symptoms of anxiety, tightness in chest, stress headaches, and restlessness. Ex. 15 (Excerpts of ██ Records) at P028306.

34

22.    The LPC (licensed professional counselor) documenting his symptoms referred him to a psych provider for evaluation and noted he wanted to discuss medication options to reduce his symptoms. Ex. 15 at P028319.

23.    ▉ had a history of hypertension, diabetes, and substance use. Ex. 15 at P028354.

24.    He was not seen or evaluated for his report of chest tightness on October 28. Ex. 15 at P028306, P028319.

25.    On November 3, 2019, he was found unresponsive and was determined to be deceased. Ex. 15 at P028355-56.

26.    His cause of death was atherosclerotic cardiovascular disease. Ex. 15 at P028230.

▉

27.    On July 21, 2015, ▉ had a chest x-ray that indicated a mildly enlarged heart with haziness in the perihilar regions that may indicate mild changes of congestive heart failure; underlying perihilar infiltrated cannot be excluded. Ex. 8 at P019820.

28.    On or about August 13, 2015, he had an abnormal EKG from which an anterior infarct could not be ruled out. Ex. 8 at P019824.

29.    On January 28, 2016 at 4:30am, ▉ presented to medical staff with 4.5 hours of 4 out of 10 chest pain and abnormal vitals including an elevated blood pressure. Ex. 8 at P019734.

30.    ▉ had a medical history of sleep apnea, diabetes, hypertension with COPD, and hyperlipidemia. Ex. 8 at P019744.

31.    The chest pain started at midnight while he was laying down; he had a history of congestive heart failure; he was scheduled to see the doctor that day. Ex. 8 at P019734-35.

32.    The doctor saw him at 9am, recorded an elevated blood pressure; documented "no acute changes" related to his EKG but did not document what the results of the EKG were or

35

whether they were borderline or abnormal; and he told ▮ to return for a follow-up visit in 2 months. Ex. 8 at P019733.

33.     On March 6, 2016 (presumably this is a mistake because he died on March 5) at 3:10am, ▮ presented to medical staff with sudden shortness of breath, noted past medical history of asthma, prescribed inhalers, edema in his legs, previous hospitalizations, worsens when walking, cough, wheezing, pulse 107, respirations 30, pulse oximeter 85%, positive appearance for respiratory distress, unable to say complete sentences; no blood pressure was documented. Ex. 8 at P019738-39.

34.     The on-call doctor ordered Lasix. Ex. 8 at P019740.

35.     It was inappropriate to order Lasix without having his full vital signs. Dkt. 139-1 at 120:4-11.

36.     An ambulance arrived at approximately 3:40am. Ex. 8 at P019740.

37.     He died on March 5, 2015 due to coronary artery atherosclerosis with significant contributing factors of hypertensive cardiovascular disease and diabetes mellitus. Ex. 8 at P029385-90.

▮

38.     ▮. was admitted to the infirmary on February 14, 2017 for follow up on pain to the legs, left ankle, and left knee, bilateral edema pitting, pale conjunctive, anasarca, anemia, and lack of energy. Ex. 16 (Excerpts of ▮ Records) at P015072-80.

39.     ▮ had months of cirrhosis, a few months of anemia, and +2 edema bilaterally. Ex. 16 at P015075-80.

40.     His condition declined over the next 4 days, including: continued and increasing pain, lack of energy, end stage liver cirrhosis with low albumin and mild anasarca, traumatic

anserine bursitis, anemia, hypertension, slight yellow complexion, abnormal lab values, swelling around knee, pedal pulses + x2, stool positive for occult blood, coughing, variceal bleeding, lethargy following large bowel movement with vomiting, inability to stand, and finally responsive to name and sternal rub only. Ex. 16 at P015072-96.

41.    He was sent to the hospital only after he was unable to stand and responsive to name and sternal rub only on February 18, 2017. Ex. 16 at P015118.

42.    ██. died that same day of hypertensive cardiovascular disease. He was 65 years old. Ex. 16 at P029373-P029377.

43.    Dr. Kariko found a series of failing to fully work up and diagnose symptoms he presented with in the past including when he presented with dizziness, blurred vision, and numbness and tingling; when he was found to have a new heart murmur; when his leg pain became unbearable; when his stool revealed blood; and when his blood pressure dropped despite losing blood in his stool. Dkt. 132 at 42-43.

██

44.    On May 11, 2015, ██ was assessed by a nurse and had abnormal vital signs including an elevated blood pressure, abdominal pain, and vomiting that started the night before. Ex. 10 at P023772.

45.    On May 12, 2015, ██ was sent to the hospital following 36 hours of vomiting and abdominal pain shifting to the right lower quadrant to rule out acute appendicitis. Ex. 10 at P023785.

46.    ██ died on May 13, 2015, at 50-years old due to hypertensive cardiovascular disease with significant contributing factors of obesity and fatty liver disease. Ex. 10 at P023729-35.

47.    On March 16, 2015, ▮ had an EKG that was documented to be abnormal; it says "QT prolonged.". Ex. 11 at P035025.

48.    He was given aspirin for 6 months and a psych evaluation. Ex. 11 at P035025.

49.    On March 30, he had an increased pulse rate. Ex. 11 at P035026.

50.    He was seen by a provider on the same day and assessed for hypercholesterolemia; his abnormal EKG was not documented or discussed. Ex. 11 at P035043.

51.    On June 13, he was seen by a nurse for a report of 5 out of 10 pain associated with burning in the throat that began a month ago. He was ordered an antaci-d and Zantac; no provider was consulted. The abnormal EKG was not repeated or discussed. Ex. 11 at P035029.

52.    He was seen on June 19 for the same thing, but the pain was now 6 out of 10. The abnormal EKG was not repeated or discussed. Ex. 11 at P035030.

53.    On June 23, he was seen by a nurse practitioner for his throat pain and for having "hazy thoughts." The NP ordered labs for CBC and H.pylori; Zantac; advised him to avoid hot sauce; discussed Gerd measures; and advised him to see mental health for psych issues. No examination was performed. Ex. 11 at P035032.

54.    Three days later on June 26, ▮ was found unresponsive with a "baseball size amount of blood" on the floor next to him. Ex. 11 at P035033.

55.    ▮ died at 37-years-old from acute myocardial infarct due to severe coronary artery narrowing due to atherosclerotic cardiovascular disease. Ex. 11 at P004782.

56.    ▮ presented with 8 out of 10 abdominal pain and diarrhea that had persisted for 2 days. His blood pressure was not taken, he did not have an elevated temperature, his pulse was

38

elevated. The nurse documented signs and symptoms of Covid 19, ordered acetaminophen, throat lozenges, and Pepto-Bismol; she did not contact a provider. Ex. 17 (Excerpts of ███. Records) at P022899.

57.     He was not seen again by medical until he was found dead 5 days later on January 20, 2021. Ex. 17 at P022901-02.

███

58.     ███ had hypertension, asthma, diabetic neuropathy, mild gunshot wound in extremities and abdomen, and burns on his skin. Ex. 18 (Excerpts of ███ Records) at P034457.

59.     On December 1, 2015, his congestive heart failure was flaring up, and he saw doctor who adjusted his medications and instructed him to follow up with him as needed. Ex. 18 at P034568.

60.     On the same day, he was seen for ongoing athletes foot and itching under belly, believed to be caused by an allergic reaction. Ex. 18 at P034569-70.

61.     His skin rash persisted "off and on, all the time" and itched and burned. Ex. 18 at P034573-74.

62.     On December 10, he was seen for shortness of breath that had been ongoing for 1-2 weeks. No provider was contacted or consulted, but he was scheduled for an appointment on 12/28. He also complained again about his skin rash and itching. Ex. 18 at P034579-80.

63.     Two days later on December 12, a Code 3 was called when he fell off his chair to the ground in his cell; he thinks he dozed off; this was not the first time he had fallen. His vitals were taken and he was instructed to follow up with health care as needed. No provider was consulted. Ex. 18 at P034581.

64.    At 8:15am on December 14, he was found on his floor unresponsive. His cause of death is unknown. Ex. 18 at P034990.

█████

65.    ████ had a history of medical diagnoses including hypertension, diabetes, Hepatitis C, neuropathy, grade 2 esophageal varices, decompensated cirrhosis, and open wounds. Ex. 12 at P024162, P024167.

66.    On October 16, 2014 ████ presented to medical staff not feeling well with diarrhea, chills, body aches, headaches, feeling thirsty, and pain and swelling in his legs. He was tachycardic, had labored respirations, low grade fever, and bilateral lower extremity pitting edema. Ex. 12 at P024163.

67.    He was admitted to the infirmary by a nurse practitioner ("NP") rather than sent to the hospital; the NP did not conduct an examination. Ex. 12 at P024165.

68.    Later that day at 6:40pm, an LPN notes that he threw up blood, was dizzy, and had abnormal vital signs including low blood pressure, low pulse, and high respirations. The plan was to have an RN assess him. Ex. 12 at P024171.

69.    An RN did not assess him until 7:25pm, who called the on call doctor and got an order to send him to the hospital. The call with the doctor was noted at 1750, presumably it was meant to be 1950 (7:50pm). Ex. 12 at P024172.

70.    It is noted that he left by ambulance at 1835 (6:45pm), however it is unclear if this time is correct considering the other times reported. Ex. 12 at P024172.

71.    ████ died at the hospital on October 17, 2014. Ex. 12 P024173.

40

███

72.    ███ had diabetes and congestive heart failure, and on October 6, 2018, presented with edema in the legs, face, and abdomen at times, abdomen distended, feelings of shortness of breath, trouble sleeping due to shortness of breath. Ex. 19 (Excerpts of ███ Records) at P031848.

73.    He began experiencing chest pain on October 8, 2018, was seen by an MD, and the plan was to continue fluid restriction and continue plan of care. Ex. 19 at P031851.

74.    On October 9, he had an irregular heart rate and rhythm. Ex. 19 at P031851.

75.    On October 9, he reported shortness of breath and feeling like he was dying. Ex. 19 at P031852.

76.    On October 10, he reported "I feel worse yet the doctor is not doing anything about it. If the doctor doesn't care why should I." Ex. 19 at P031852.

77.    On October 11, the MD saw him and noted him to be at risk of impaired breathing. Ex. 19 at P031853.

78.    On October 12, he reported "I can't catch my breath and when I lay down it feels like something is sitting on my chest. They have to do something, I need medical attention." The nurse noted his entire body is swollen with fluids, he gained 22 pounds since 10/1, 2-3+ pitting edema bilateral legs, audible wheezing heard, low blood pressure, low oxygen, and refused to wear BIPAP. The doctor was informed by phone. Ex. 19 at P031856.

79.    He continued to have similar symptoms until he was sent to the hospital on October 13 and again on October 15-20. Ex. 19 at P031857-P031866.

80.    He continued to deteriorate until he died in the infirmary on November 6, 2018 at 45-years-old. Ex. 19 at P031815-30.

41

81.    On October 20, 2015 ▮ was admitted to the infirmary complaining of shortness of breath for two days, hadn't eaten all day, low oxygen, pitting edema, yellow sclera, ascites, abnormal vital signs, and with confusion. The on-call doctor ordered Lasix, admit to infirmary, and recheck vital signs within one hour. Ex. 20 (Excerpts of ▮. Records) at P037178-79.

82.    On the same day he vomited green and red and his confusion continued, he made no sense while talking. Ex. 20 at P037184-85.

83.    On the morning of October 22, he was transferred to the hospital following a seizure, altered mental state, and hepatic failure. Ex. 20 at P037188.

84.    He died on October 24, 2015 at 43 years old due to intracerebral hemorrhage due to hypertensive and arteriosclerotic cardiovascular disease. Ex. 20 at P037194.

85.    On December 16, 2020, ▮ presented for diabetes chronic care clinic visit and had fine hand tremors, also noted diagnoses of hypertension and hyperlipidemia. Ex. 21 (Excerpts of ▮ Records) at P028903-4.

86.    On December 16, 2020, ▮ had an abnormal EKG showing prolonged QT and nonspecific T wave abnormality. Ex. 21 at P028776.

87.    This revealed acute changes and signs of ischemia. Dkt. 139-1 at 72:21-24; Ex. 21 at P028903-04.

88.    On December 23, a Wexford provider reviewed the EKG and noted there were no acute changes, despite the presentation of acute changes. Ex. 21 at P028776.

89.    Medical staff took no action following the abnormal EKG.

42

90.    Medical staff not only failed to intervene on the abnormal EKG but also failed to accurately note its findings when they saw ▮ during subsequent chronic care visits. Dkt. 139-1 at 73:1-5.

91.    On March 4, he had labs drawn and another EKG for chronic hypertension clinic. His EKG was abnormal revealing T wave abnormality, with a note from the reviewer to consider inferolateral ischemia. A Wexford provider reviewed the EKG report and findings on March 8. Ex. 21 at P028956, P028841.

92.    The abnormal EKG and possible ischemia were not discussed in his March 11 chronic care visit. Ex. 21 at P028895-96.

93.    When conducting an EKG, it is important to assess what symptoms, if any, a patient is experiencing. Dkt. 139-1 at 73:14-17.

94.    He was seen a month later on April 9 for chronic care and his condition was noted to be unchanged since his last visit, the EKGs were not discussed, and there was no repeated EKG. Ex. 21 at P028901-02.

95.    At those subsequent chronic care visits, providers did not assess ▮. for chest pain or shortness of breath. Dkt. 139-1 at 73:6-10.

96.    It is especially important to assess a patient's symptoms when they have an abnormal EKG. Dkt. 139-1 at 73:17-19.

97.    Despite his EKG showing signs of ischemia and his history of high blood pressure, high cholesterol, and diabetes, providers failed to order any further testing, including a follow-up EKG, a cardiac stress test, or a general cardiology consultation. Dkt. 139-1 at 74:10-19.

98.    On September 12, 2021, he was found unresponsive and deceased. The presumptive cause of death was cardiac arrest. Ex. 21 at P028991.

■

99. On 5/10/2019, ■ had an abnormal EKG following a squeezing feeling in his chest and a history of coronary artery disease, angioplasty, stents and hyperlipidemia. Ex. 7 at P019993.

100. The doctor noted sinus bradycardia, nonspecific ST-T wave changes, and one other illegible finding. There was no order for any further testing. Ex. 7 at P019993.

101. On 6/30/19 at 11:45am, ■ presented with 8 out of 10 chest pain and abnormal vital signs. He noted this pain always starts before he needs a stent. A doctor ordered 23 hour observation in the infirmary, labs drawn in the morning including cardiac enzymes, D-dimer and some others. No EKG was ordered. Ex. 7 at P019998-99.

102. His pain worsened in the infirmary until the on-call doctor allowed him to be sent via ambulance to the hospital over 12 hours later at 1am on 7/1/2019. Ex. 7 at P020003.

103. Following his hospital visit, ■'s cardiac health was monitored until October 2019. Ex. 7 at P020278-79.

104. ■ was seen on March 4, 2020 by the doctor for knee pain during which his cardiac condition was not assessed. Ex. 7 at P020022.

105. ■ had a cardiac arrest and died on March 9, 2020. Ex. 7 at P020020-24.

■

106. ■ was sick for a while and being monitored for dementia, consistently hypertensive blood pressure, rashes, and edema. *See generally* Ex. 22 (Excerpts of ■ Records) at P014627-70.

107. On April 22, 2019, ■ had an abnormal EKG with junctional rhythm, anterior infarct age undetermined. Ex. 22 at P014906.

44

108.    The Wexford doctor noted the EKG findings, noted sinus bradycardia, and trace edema, but did nothing in response. Ex. 22 at P014346.

109.    On October 9, 2019, he had an abnormal EKG that revealed marked sinus bradycardia with first-degree AV block with fusion complexities, T wave abnormality, and an instruction to consider lateral ischemia. Ex. 22 at P014907.

110.    Following review of the EKG, the Wexford doctor noted fluctuating BP, no chest pain, sinus bradycardia, lungs clear, no edema, premature ventricular contraction. No new order followed. Ex. 22 at P014738.

111.    Wexford medical staff ignored two EKGs, six months apart, that showed changes consistent with ischemia. Dkt. 132 at 43.

112.    Despite blood pressure rising to dangerous levels, ▮ was not sent to the emergency room for evaluation or to a cardiologist for consultation. Dkt. 132 at 43.

113.    On December 24, 2019 at 4pm, ▮ reported being cold, had shallow and labored respirations, lungs diminished in all lobes with course rhonchi noted bilaterally, and he has not eaten for the past couple of days. Ex. 22 at P014829-31. No testing was ordered. *Id.*

114.    Later that day at 7pm, he was grabbing his chest, saying he couldn't breathe, was short of breath and diaphoretic, gasping for air at times. Three EKGs were performed indicating acute myocardial infarction. It took 48 minutes before he left in an ambulance. Ex. 22 at P014832-33.

115.    Even when ▮ developed shallow and labored breathing, he was monitored in the infirmary for three hours before being sent to the emergency room. Dkt. 132 at 43.

116.    ▮ died 4 days after his heart attack on 12/28/2019 from acute myocardial infarction due to ruptured atherosclerotic plaque. Ex. 22 at P029369-72.

45

**Wexford Was Long Aware of Widespread Medical Errors and Failed to Correct Them.**

*Lippert v. Godinez* **Findings.**

117.    In October 2018, a medical investigation team issued a Statewide Summary Report in the case of *Lippert v. Godinez*, No. 10-cv-4603 (N.D. Ill.) (the "Lippert Report"). Ex. 23 (2018 Lippert Report) P008504-9703. The report was prepared at the request of the District Judge, who requested that the court-appointed expert and investigation team make findings with respect to systemic deficiencies in the healthcare services within IDOC, including whether changes were appropriately made following earlier findings in 2014. *Id.* at P008506.

118.    The expert findings in the 2018 Lippert report—including findings related to escalating care to higher-level providers or offsite care and insufficient nursing assessments—were unchanged from their findings in the 2014 report. Ex. 23 at P008564; Ex. 24 (Cont. Fisher Dep.) at 18:23-19:1.

119.    One of those unchanged findings was that nurses and clinicians failed to identify when patients required emergency room services and/or hospitalization. Ex. 23 at P008563; Ex. 24 at 19:2-8.

120.    Wexford was unable to identify any investigation or action taken as a result of the court monitors' finding that staff failed to identify when patients needed emergency care. Ex. 24 at 20-23.

121.    The 2018 Lippert report also found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician. Ex. 23 at P0008563; Ex. 24 at 13:5-7.

122.    One example of inadequate care identified by the court monitors was a patient at Taylorville who had an episode of chest pain and the doctor ordered a routine next day visit instead of sending the patient to the emergency room. Ex. 23 at P009259-61.

123.    At the subsequent day's evaluation, the EKG showed an inadequate tracing but was nevertheless suspicious for acute coronary syndrome. The doctor recommended that the patient get a stress test on discharge from prison, but he took no immediate action to determine if the patient had angina and did not start anti-anginal medication. *Id.*

124.    This patient died and the court monitor determined the death was possibly preventable. *Id.*

125.    The court monitor found there were still no written policies that provide guidance to the Wexford clinical staff on which conditions or level of instability exceed the capabilities of the infirmaries and should be promptly referred to a hospital. Ex. 23 at P008573-81.

**Failures to Conduct Adequate Quality Improvement.**

126.    The *Lippert* court monitor found that the annual reports and quality improvement studies conducted were ineffective, facilities were not measuring quality against a standard, and there was also an absence of evaluation of clinical quality, which contributes to preventable morbidity and mortality. Ex. 23 at P008622.

127.    Plaintiff's nursing expert, Johnnie Lambert, has been a registered nurse for over 50 years, has experience in cardiovascular and emergency nursing, has worked in correctional health for 28 years, is a Certified Correctional Health Care Professional-Advanced, writes policies and procedures for correctional facilities, and trains nurses working in correctional facilities. Dkt. 130-15 at 1.

128.    Based on the quality improvement (QI) documents from 2020 and 2021 from Taylorville and Wexford's supplemental responses to the third set of Requests to Admit, Nurse Lambert identified multiple systemic nursing issues at Taylorville. Dkt. 130-15 at 5.

129.    Taylorville lacked a full-time medical director from at least October 2020 through Mr. Eastman's death. Dkt. 130-15 at 5.

130.    As a result, Dr. Duncan and Dr. Myers filled in for certain shifts, but no single physician managed or oversaw the department. Dkt. 130-5 at 121:5-9; Dkt. 130-9 at 93:25-94:4; 101:15-102:4.

131.    In January, February, and March 2021, there were 2.4 FTE RN vacancies. In March 2021, one of those vacancies was the Director of Nursing. April vacancies stood at ¼ FTE RN, indicating that one nurse had been hired since March. Staff shortages also paused QI studies. Ex. 25 (Dec. 2021 Taylorville QI Memo.) at P022216; Dkt. 130-15 at 5.

132.    Between January and April 2021, there were numerous medication errors, which can be associated with lack of staff, inadequate training, time constraints, or other issues. Dkt. 130-15 at 5-6.

133.    Medication errors included transcription errors, omission of medications, and administration of wrong medications to patients. No corrective action plans were taken to improve these conditions. Dkt. 130-15 at 6; Ex. 26 (Wexford's Suppl. Resps. to 3rd Set of RTAs).

134.    Nurses were not involved in any quality improvement meetings or activities and stated that they had no personal knowledge of any formal qualitative review activities, even though all staff should be aware of the findings of QI measures. Dkt. 130-15 at 6.

135.    One of the areas identified during the QI meetings of April and May 2021 was non-compliance in the infirmary process. Dkt. 130-15 at 6.

136.    In Mr. Eastman's case, nurses failed to comply with infirmary process by failing to adequately document care in his medical record, and there was a lack of observation, a failure to measure vital signs, and incomplete or inaccurate descriptions of his condition. Dkt. 130-15 at 6.

48

137.    Further, in Mr. Eastman's case, infirmary policies were violated: no one completed admission documentation, no one completed an admission or discharge assessment or summary, there was no admission or discharge diagnosis, no follow up appointment was made, no doctor ever examined Mr. Eastman, and none of these failures were discussed in the QI minutes so that improvements could be made going forward. Dkt. 130-15 at 6; Ex. 1 at P000026-37; Ex. 27 (AD 04.03.120 Offender Infirmary Services (10/1/19)) P004605-07.

138.    IDOC held monthly Quality Improvement ("QI") meetings, which were attended by Wexford's contract manager. The lack of a medical director and available providers was a recurrent issue raised during these meetings. *See* Ex. 28 (Jan. 2021 Taylorville QI Memo.) P022168 (noting concerns about "not having any providers" and the need for providers).

139.    The February 2021 QI minutes noted "facility medical director-vacant" next to "critical incidents," and the need for a plan to be included for offenders classified as poor for all clinics. Ex. 29 (Feb. 2021 Taylorville QI Memo.) P022171.

140.    The March 2021 QI minutes again noted the medical director vacancy and additionally noted a director of nursing vacancy. Ex. 30 (Mar. 2021 Taylorville QI Memo.) P0022175.

141.    The April 2021 QI minutes reported zero mortalities, despite Mr. Eastman having died that month. Ex. 31 (Apr. 2021 Taylorville QI Memo.) P022180.

142.    The minutes also documented ten separate nursing medication errors during April 2021. Ex. 31.

143.    The Healthcare Unit Administrator reported that people in the infirmary were being seen "about two times a week" rather than the required three. Ex. 31.

49

144. The minutes further noted that Wexford nurses needed discipline and accountability, but no firm plan was made to accomplish that. Ex. 31.

145. Similar errors over multiple months multiplied. Ex. 25.

146. By December 2021, nursing sick call was backlogged by 100 or more; Wexford nurses were not following orders to expand nursing sick call times; and patients were waiting months to see a doctor and weeks to see a nurse, such that the HCUA "fears something will be missed." Ex. 25.

147. The HCUA noted that nursing needed to be held responsible, that staff shortages were not a sufficient excuse when there were three staff on the day shift, and that there was still no medical director or full-time physician. Ex. 25.

148. The HCUA further noted the need for Wexford management to be present on site to hold staff accountable; stated there was no excuse for nursing sick call not being completed; requested documentation that nursing staff had been "spoken to"; and demanded a corrective action plan to address the backlog of patients needing to be seen by a physician. Ex. 25.

149. After reviewing the Quality Improvement Reviews, Dr. Kariko opined that it was evident patients did not have access to adequate health care, including access to sick call for urgent issues, chronic disease management, and infirmary-level care. This resulted in delayed treatment, interruptions in medications, and poor management of chronic conditions. For the entire year, both the Illinois Department of Corrections and Wexford Health were aware of the seriousness of the situation but failed to provide a solution. Dkt. 132 at 36.

150. Dr. Kariko opined that, given the severe shortage of medical staffing—including the absence of a full-time physician—Taylorville did not have the ability to safely provide patient care, including urgent care, chronic care, and infirmary care. Dkt. 132 at 37.

50

151.    Dr. Kariko found it shocking that an on-call physician, knowing the staffing situation at the facility, would choose to admit Mr. Eastman to the infirmary instead of directly to the emergency room, where he would have been guaranteed access not only to laboratory testing and advanced imaging but also to a physician able to complete a thorough evaluation. Dkt. 132 at 37.

152.    Dr. Kariko also opined that it is evident Wexford and the Illinois Department of Corrections were aware of these issues and did nothing to intervene. Dkt. 132 at 37.

153.    Wexford conducts peer reviews of physicians but has no position on whether the corrective plan and follow-up must be documented. Dkt. 132 at 28; Dkt. 140-4 (Fisher Dep.) at 176.

154.    Wexford was aware of Defendant Duncan's performance errors for many years and failed to correct them. His 2015 peer review indicated errors including frequent problems with infirmary admissions and discharges, and progress notes that frequently needed improvement. Ex. 32 (Excerpts of Duncan's Peer Reviews) at Wexford Bates 004458-61.

155.    Defendant Duncan's 2019 peer reviews also indicate multiple areas in which he needed improvement, including failing to document a patient's history, failing to document labs, failing to address concerns stated in the history, failing to address medical problems, failing to address continued care for a chest complaint, failing to order testing, failing to conduct targeted physical exams and document pertinent findings, failing to follow up after a test was completed, failing to write notes during infirmary admissions, failing to see patients while in the infirmary, and failing to respond to significant nursing entries. Ex. 32 at Bates 004508-4546.

156.    Several of Defendant Duncan's peer reviews in 2020-2021 indicated that he needed improvement because he was failing to document physician examinations and level of disease,

51

failing to address a patient's high blood pressure, failing to document patient education, failing to document the subjective portion of a patient's note, and failing to specify whether a patient was a chronic or acute admission. Ex. 32 at Bates 004551, 4552, 4557, 4558, 4559, 4561, 4562.

157.    Similarly, nursing Defendant Mansfield had an extensive disciplinary history at Taylorville for failing to follow those practices, including multiple unpaid suspensions for incompetence; failure to follow policy and procedures; failing to contact a doctor after an abnormal blood pressure, pulse, and EKG from a patient; multiple medication errors; documentation errors; failing to follow MD referral protocol resulting in a patient's need for emergency surgery and a permanent colostomy; and failing to transcribe orders properly, resulting in a patient receiving incorrect medication doses for 22 days and another patient receiving an incorrect dose for 24 days. Ex. 33 (Mansfield Personnel File) at Wexford Bates 002572, 2574; Dkt. 130-15 at 11-12.

## LEGAL STANDARD

Summary judgment must be denied unless Wexford establishes that "there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law." *McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024). In deciding the motion, the Court must "read the facts and draw all reasonable inferences in the light most favorable" to Plaintiff. *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

**ARGUMENT**

A reasonable jury could find Wexford liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which provides the framework for Section 1983 liability against corporate defendants like Wexford.

Under *Monell*, a private corporation, like Wexford, can be liable under 42 U.S.C. § 1983 when a plaintiff demonstrates that an unconstitutional "policy or custom" of the entity was the "moving force" behind the constitutional deprivation. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 386 (7th Cir. 2017) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)) (en banc). A practice "so widespread as to have the force of law" satisfies this standard even absent a formal written policy. *Id.* at 384 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 404). This Circuit has recognized that a pattern of similar constitutional violations, supported by expert testimony, is sufficient to create a genuine dispute for trial. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021); *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 917 (N.D. Ill. 2016) (expert testimony supported plaintiff's claim of widespread practice at summary judgment).

## I.     Unrebutted Expert Opinion Identifies Widespread Practices of Deficient Care.

Plaintiff's retained expert, Dr. Sara Kariko, analyzed numerous third-party records involving Wexford's provision of care across IDOC facilities. Dkt. 132 (Kariko Report) at 39. In conducting her review, Dr. Kariko identified numerous deficiencies with Wexford's care. Those deficiencies can be distilled into at least two widespread practices: (1) the failure to appropriately evaluate patients and (2) the failure to appropriately escalate patient care—whether to a higher-level provider or offsite for emergent care. *See, e.g.*, *Neely v. Randle*, 2013 WL 3321451, at *6 (N.D. Ill. June 29, 2013) (permitting a *Monell* claim based on "routine delays and denials of medical care and nonresponsiveness to requests for care" to proceed); *See* Ex. 34 (*Johnson v.*

53

*Wexford Health Sources, Inc.*, 23-cv-1234, Dkt. 285 at 17 (C.D. Il. July 1, 2026)) (denying summary judgment to Wexford on *Monell* claim where plaintiff's identified policies and widespread practices broadly fell into categories that included "deficient medical care").

"Expert testimony is a form of evidence. Like all the other evidence reviewed at summary judgement, it must be evaluated by the Court in the light most favorable to the non-moving party." *Jones v. Wexford Health Sources, Inc.*, 2021 WL 323792, at *4 (N.D. Ill. Feb. 1, 2021). Dr. Kariko is board-certified in Internal Medicine with over ten years of experience in correctional healthcare. *See generally* Dkt. 130-17 (Kariko Resume). She served as Facility Medical Director and Chief Medical Officer for the Washington State Department of Corrections, where she was responsible for overseeing the delivery of healthcare services to incarcerated individuals across multiple facilities. *See generally* Dkt. 130-17 (Kariko Resume); Dkt. 132 at 1-2. Wexford has not challenged Dr. Kariko's qualifications, has not moved to exclude her as an expert, and has not argued that any of her opinions against it are inadmissible. Indeed, Wexford has not even retained its own medical expert to rebut her findings related to Plaintiff's *Monell* claim.

Dr. Kariko's review of the third-party medical records, a subset of which are summarized below, revealed numerous instances, as in Mr. Eastman's case, where Wexford medical staff, across the Illinois Department of Corrections, failed to appropriately evaluate patients and failed to escalate care—whether by sending them offsite or to a higher level provider—for individuals experiencing emergent symptoms and conditions. Despite Wexford's protestation to the contrary, the deficiencies in these patients' care are strikingly similar to the deficiencies in Mr. Eastman's care.

54

███ presented to Wexford staff, like Mr. Eastman, with life-threatening symptoms—shortness of breath and life-threatening vital signs, including a pulse rate of 133, falling oxygen levels, audible wheezing, and a known history of lung and heart failure. PSOFW ¶ 2. Nevertheless, nursing staff simply gave ███ an inhaler and instructed him to follow up as needed. *Id*. No provider was notified. PSOFW ¶ 3. The next day, ███ pushed the button to summon emergent help due to shortness of breath, respiratory distress, labored breathing, diaphoresis, inability to speak, skin pale, diminished lung sounds, chest pain and tightness. *Id*. ███ was finally sent by ambulance to the hospital. PSOFW ¶ 4. By the time ███ arrived at the hospital, he was in critical condition and required ICU-level care. PSOFW ¶ 6. Late that night, he died, like Mr. Eastman, from cardiac complications. PSOFW ¶ 8.

Similarly, ███., a patient with hypertension, notified a CMT that he got short of breath while washing up, and noted that he was a dialysis patient. PSOFW ¶ 11. Instead of escalating his care, staff delayed. PSOFW ¶¶ 11-16, 19. Later, by the time ███ made it to the healthcare unit, he was hypoxic, had an elevated heart rate, high respirations, and high blood pressure. PSOFW ¶ 16. An ambulance was called and CPR started but it was too late, and ███ died that day of hypertensive cardiovascular disease at 39 years old. PSOFW ¶ 18.

███ reported anxiety, tightness in his chest, stress headaches, and restlessness. PSOFW ¶ 21. ███ also had a history of hypertension, diabetes, and substance use. PSOFW ¶ 23. Instead of having his care escalated, ███ was referred to mental-health provider to discuss medication options to reduce his symptoms. PSOFW ¶¶ 22-24. ███ was not evaluated for his report of chest

tightness and less than a week later was found dead from cardiovascular disease. PSOFW ¶¶ 25-26.

█████

███. had a history of diabetes, hypertension, COPD, and hyperlipidemia, and prior testing revealed a mildly enlarged heart that could indicate congestive heart failure and, like Mr. Eastman, an abnormal EKG from which an anterior infarct could not be ruled out. PSOFW ¶ 27. When he presented with chest pain and elevated blood pressure, the doctor documented "no acute changes" on his EKG but failed to record what the EKG results actually were or whether they were borderline or abnormal, and simply told him to return in two months. PSOFW ¶¶ 28, 32. When ████ presented again in acute respiratory distress—with dangerously low oxygen saturation, inability to speak in complete sentences, elevated pulse, and rapid respirations—his blood pressure was not measured, and the on-call doctor ordered Lasix without obtaining full vital signs, which was clinically inappropriate. PSOFW ¶¶ 34-35. An ambulance was called, but ████ died, like Mr. Eastman, of cardiovascular disease. PSOFW ¶¶ 36-37.

█████

████ had months of documented cirrhosis, anemia, and bilateral pitting edema, yet medical staff repeatedly failed to fully work up and diagnose his symptoms (as in Mr. Eastman's case), which included dizziness, blurred vision, numbness and tingling, a new heart murmur, worsening leg pain, blood in his stool, and dropping blood pressure despite gastrointestinal bleeding. PSOFW ¶¶ 40-41. After he was admitted to the infirmary, his condition steadily deteriorated over four days, with increasing pain, end-stage liver cirrhosis, low albumin, anasarca, anemia, abnormal lab values, variceal bleeding, coughing, and eventual lethargy. *Id*. Despite this progressive decline,

56

███ was not transferred to a hospital until he was unable to stand and responsive only to his name and a sternal rub. PSOFW ¶¶ 40-43. He died that day. PSOFW ¶ 42.

███

███ presented with abnormal vital signs including elevated blood pressure, abdominal pain, and vomiting that had started the night before, but he was not sent to the hospital at that time. PSOFW ¶¶ 44-45. He was not transferred until the following day—after enduring 36 hours of vomiting and abdominal pain that had shifted to the right lower quadrant—to rule out acute appendicitis. PSOFW ¶ 45. Without escalating his care, ███ died two days later from hypertensive cardiovascular disease with significant contributing factors of obesity and fatty liver disease. PSOFW ¶ 46.

███

███., like Mr. Eastman, had an abnormal EKG that was never repeated or discussed at any subsequent visit. PSOFW ¶ 47. When a provider saw him for hypercholesterolemia, the abnormal EKG was not addressed. PSOFW ¶ 50. When ███'s condition worsened, nurses treated his complaints with antacids and dietary advice without consulting a provider, and a nurse practitioner who saw him performed no physical examination and did not revisit the abnormal EKG. PSOFW ¶¶ 51-53. ███. was never referred for cardiac evaluation or further diagnostic testing despite his documented cardiac abnormality. PSOFW ¶ 53. He was found unresponsive with blood on the floor next to him, dead from an acute myocardial infarct due to severe coronary artery narrowing from atherosclerotic cardiovascular disease. PSOFW ¶¶ 54-55.

███

Similar to Mr. Eastman, ███ presented with pain that he rated 8 out of 10 and diarrhea that had persisted for two days, along with an elevated pulse, yet his blood pressure was not taken,

57

and the nurse failed to contact a provider. PSOFW ¶ 56. Instead, a nurse documented signs and symptoms of COVID-19 and ordered only acetaminophen, throat lozenges, and Pepto-Bismol— an inadequate diagnostic evaluation for the severity of his symptoms. *Id.* ▮ was not seen again by medical staff and was found dead five days later. PSOFW ¶ 57.

▮

▮ had a significant medical history including hypertension, asthma, diabetic neuropathy, congestive heart failure, burns, and congestive heart failure. PSOFW ¶ 58. When his cardiovascular disease flared up, the Wexford doctor merely adjusted his medications and told him to follow up as needed. PSOFW ¶ 59. When he later presented with shortness of breath that had been ongoing for one to two weeks, no provider was contacted or consulted, and he was simply scheduled for an appointment nearly three weeks later. PSOFW ¶¶ 59, 62. Two days after that, ▮ fell off a chair in his cell. PSOFW ¶ 63. Despite this being a potential indicator of a serious underlying cardiac or neurological condition, no provider was consulted, and ▮ was simply told to follow up with health care as needed. *Id.* He was found unresponsive and dead in his cell days later. PSOFW ¶ 64.

▮

▮ had a serious medical history including decompensated cirrhosis, esophageal varices, hypertension, diabetes, and Hepatitis C. PSOFW ¶ 65. When he presented with diarrhea, chills, body aches, tachycardia, labored respirations, low-grade fever, and bilateral pitting edema, a nurse practitioner admitted him to the infirmary rather than sending him to a hospital and did not conduct an examination. PSOFW ¶ 66. Hours later, when ▮ vomited blood and exhibited dangerously abnormal vital signs including low blood pressure, low pulse, and high respirations, a nurse failed to assess him for approximately 45 minutes, and there were further delays before he was finally

58

sent to the hospital by ambulance. PSOFW ¶ 68. ▮ died at the hospital the following day. PSOFW ¶¶ 68-71.

▮

▮ had diabetes and congestive heart failure and presented with edema throughout his body, shortness of breath, and trouble sleeping. PSOFW ¶ 72. Despite developing chest pain, an irregular heart rhythm, and reporting that he felt like he was dying, the plan was simply to continue fluid restriction and the existing plan of care. PSOFW ¶ 73. Days later, ▮.'s entire body was swollen, he had gained 22 pounds in less than two weeks, was audibly wheezing, had low blood pressure, and low oxygen. PSOFW ¶ 76-78. Yet the physician was only informed by phone and ▮ was not sent to a hospital until nearly a week after the onset of chest pain and worsening symptoms. PSOFW ¶¶ 78-79. ▮. continued to deteriorate, ultimately dying in the prison infirmary. PSOFW ¶ 80.

▮

▮ had a history of coronary artery disease, prior angioplasty, stents, and hyperlipidemia. Like Mr. Eastman, he had an abnormal EKG following squeezing chest pain, but the doctor noted the findings and ordered no further testing. PSOFW ¶ 99. Like Mr. Eastman, ▮ presented to medical with 8 out of 10 chest pain, abnormal vital signs, and stated that this type of pain always preceded him needing a stent, yet the doctor ordered only 23-hour observation in the infirmary and labs for the morning. PSOFW ¶ 101. ▮.'s pain worsened in the infirmary, but he was not sent to the hospital until over 12 hours later. PSOFW ¶ 102. After his hospital visit, his cardiac health was inadequately monitored when ▮. had cardiac arrest and died. PSOFW ¶¶ 103-05.

59

██

██ had consistently hypertensive blood pressure, and two abnormal EKGs six months apart, both showing changes consistent with ischemia, including anterior infarct and T wave abnormality with instructions to consider lateral ischemia. PSOFW ¶¶ 106-09. The Wexford doctor noted the findings on both occasions but took no action in response and ordered no further testing. PSOFW ¶ 110. Despite ██.'s blood pressure rising to dangerous levels, he was never sent to an emergency room for evaluation or referred to a cardiologist. PSOFW ¶ 112. When ██ later presented with shallow and labored breathing, diminished lung sounds, and an inability to eat for days, no testing was ordered. PSOFW ¶¶ 113-15. ██ was monitored in the infirmary for approximately three hours before finally being sent to the emergency room, only after he began grabbing his chest, gasping for air, and becoming diaphoretic, with EKGs indicating acute myocardial infarction. PSOFW ¶ 115. Even then, it took 48 minutes before ██ left by ambulance. PSOFW ¶¶ 114-15. ██ died four days later from acute myocardial infarction due to ruptured atherosclerotic plaque. PSOFW ¶ 116.

These third-party summaries make clear that Wexford repeatedly ignored emergent complaints. *See generally* PSOFW ¶¶ 1-116. Individuals experiencing such symptoms were housed in the infirmary or ignored. *See, e.g.*, PSOFW ¶¶ 38, 40-41, 67, 80, 102, 115. Many of these individuals experienced dangerous cardiovascular symptoms similar to Mr. Eastman's—like shortness of breath, diaphoresis, chest tightness, severe chest pain, heart murmurs, and abnormal vital signs. PSOFW ¶¶ 3, 40-41, 45, 56, 59, 62, 72-73, 78-79, 101. And many of them, like Mr. Eastman, succumbed to inadequately treated cardiovascular disease. *See, e.g.*, PSOFW ¶¶ 8, 18, 25-26, 36-37, 46-47, 54-55, 103-05. Medical staff—nurses and doctors alike—persistently failed to escalate care to more qualified providers or to a hospital. PSOFW ¶¶ 1-116. And many of these

60

patients were simply sent back to their housing units or left in the prison infirmary, which obviously cannot provide hospital-level care. PSOFW ¶¶ 38, 40-41, 67, 80, 102 115.

Dr. Kariko's review of third-party records is also replete with instances where Wexford medical staff failed to diagnose patients or disregarded alarming, life-threatening vital signs, and test results that indicated the presence of more emergent medical needs. PSOFW ¶¶ 1-116. For instance, many of the third parties that Dr. Kariko analyzed included alarming EKG results. PSOFW ¶¶ 28, 32, 47, 86-100, 107. Others presented with life-threatening vital signs including elevated high heart rates, elevated rates, and low oxygen saturation. PSOFW ¶¶ 1-116. Patients also presented with elevated blood pressures, yet Wexford medical staff disregarded the alarming risks associated with hypertension. *See, e.g,*, PSOFW ¶¶ 18, 23, 30, 40, 46, 58, 64, 84-85, 106.

From the care afforded these individuals, a reasonable jury could conclude that Wexford's deliberate indifference to these widespread practices caused Mr. Eastman's death. *See* Ex. 34 (*Johnson*, 23-cv-1234, Dkt. 285) at 18 (denying summary judgment where the plaintiff "extensively discusse[d] comparator cases of other individuals whose care, her experts opine, show widespread and systemic deficiencies"). In the days before he died, Defendant Braun documented Mr. Eastman's complaint of severe, knife-like and pulsating chest pain that he rated a 9 out of 10. PSOF ¶¶ 28-31. The pain radiated to his jaw and neck and worsened when he breathed deeply. PSOF ¶¶ 30, 32. His blood pressure and breathing were elevated. PSOF ¶¶ 40-41. Instead of summoning emergency care to rule out life-threatening conditions, Mr. Eastman was ordered Motrin, a chest X-ray, admission to the infirmary, a mental-health referral, and repeated EKGs, even after the results were showing that there were changes, and he was kept in the infirmary where he was not adequately monitored and he did not have access to the diagnostic resources needed to rule out an emergency. PSOF ¶¶ 71-72, 78-80, 93, 115, 123-125, 127, 174.  A jury could

reasonably conclude that Wexford's widespread practice of failing to send patients offsite in the face of emergent symptoms caused Mr. Eastman's suffering injury and death.

## II.    Plaintiff's Comparators Are Sufficiently Similar

In its attempt to earn summary judgment, Wexford primarily argues that Plaintiff's comparator cases are too dissimilar to Mr. Eastman's case. On Wexford's telling, Plaintiff must point to repeated instances where a "patient with chest pain was not sent offsite and instead was observed onsite and then died of an acute cardiac problem." Dkt. 139 at 28. Wexford badly overstates what Plaintiff must show to withstand summary judgment.

As a threshold matter, the Seventh Circuit has squarely held that comparators need not be "perfect" or identical to the plaintiff's case. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021). Rather, the pertinent question is "whether the similarities show a widespread practice that supports a finding of an unconstitutional custom or practice." *Id.* Wexford's insistence on near-identical factual scenarios is a standard that no court has ever adopted and that would effectively immunize institutional defendants from *Monell* liability. Although it far exceeds Plaintiff's burden to point to factually congruent patients, within the widespread practices described above, multiple exist.

Contrary to Wexford's contention, the patterns in this case are unmistakable. Patient after patient presented with acute, often cardiac, life-threatening symptoms. PSOFW ¶¶ 3, 40-41, 45, 56, 59, 62, 72-73, 78-79, 101. Despite obvious signs that any competent medical staff would recognize, patient after patient went undiagnosed or misdiagnosed, failed to have their care escalated, and often had their care managed onsite in the prison infirmary, which Wexford has admitted is not equipped to handle cardiac emergencies. PSOFW ¶¶ 38, 40-41, 67, 80, 102 115; PSOF ¶ 161-162. These same failures permeated Wexford's care of Mr. Eastman. Wexford's

62

attempt to nitpick factual distinctions between individual comparators misses the mark. The relevant inquiry at summary judgment is whether the evidence, viewed in the light most favorable to Plaintiff, demonstrates widespread practices. *Howell*, 987 F.3d at 657. Dr. Kariko's analysis of the third-party comparators shows that it does. At most, the weight afforded the comparators is a quintessential jury questions—not a question for the Court at the summary judgment stage. *See* Ex. 34 at 19 (*Johnson*, 23-cv-1234, Dkt. 285) ("Defendant argues the comparators are too different, and the deficiencies Plaintiff's experts point out regarding the care they received are 'cherry picked.'. . . but those are arguments for jurors to resolve.").

Wexford also argues that Plaintiff has identified too many policies in her interrogatory responses. This argument borders on frivolous. *See id.* at 17 (rejecting this exact argument by Wexford and observing that plaintiff had simply responded with 71 "individually identified policies" after being "[a]sked for additional details in discovery"). Here, Wexford served discovery demanding comprehensive identification of every policy or practice Plaintiff contended caused Mr. Eastman's death. Plaintiff provided responsive, detailed answers identifying the multiple systemic deficiencies that Dr. Kariko's expert analysis—and Wexford's own documents and testimony—revealed. Wexford cannot demand comprehensive responses and then argue that the comprehensiveness of those responses is somehow a basis for summary judgment.

Wexford also relies heavily on the Supreme Court's decision in *Connick v. Thompson*, 563 U.S. 51 (2011). But in *Connick*, which concerned an alleged spate of *Brady* violations, the plaintiff merely pointed to four prior reversed convictions with no apparent relationship to the constitutional violation that caused his wrongful conviction. *Id.* at 62. Here, by contrast, Dr. Kariko spent dozens of hours examining the specific underlying facts of each prior incident and identified multiple documented patterns akin to the deficient care provided to Mr. Eastman.

63

Wexford's other cited cases also do not help. In *Tillman v. Burge*, the court held that prior incidents *were* sufficiently similar because they involved the same type of relevant misconduct. 813 F. Supp. 2d 946 (N.D. Ill. 2011) (denying motion to dismiss a *Monell* claim alleging past instances of custodial abuse). And in *Vargas v. Wexford Health Sources, Inc.*, 2024 WL 1376369, at *12 (N.D. Ill. Mar. 31, 2024), the plaintiff did not present evidence of comparable incidents involving third parties at all, and instead "rel[ied] exclusively on his own experience." *Id.* at *11-12. Put simply, neither *Vargas* nor *Tillman* supports Wexford's contention that prior incidents must be identical to withstand summary judgment.

**III.     Wexford Had Ample Notice of the Risk and Was Deliberately Indifferent**

Dr. Kariko's analysis of third-party records shows that Wexford had extensive, repeated notice of the very deficiencies that caused Mr. Eastman's death. The Court may infer notice from the very existence of a widespread practice. *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 210 (4th Cir. 2002) ("[C]onstructive knowledge of such a custom and usage may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these.") (internal quotations and citation omitted); *see also Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987) (same). But Wexford had even more notice than that yet failed to act.

The reports in *Lippert v. Godinez*, No. 10-cv-4603 (N.D. Ill.)—created by the court-appointed monitor overseeing the consent decree governing IDOC healthcare—documented the same systemic failures. The 2014 Report found nurses and clinicians who failed to identify patient instability, and infirmaries used for unstable patients who should have been hospitalized. PSOFW ¶¶ 117-25. The later 2018 Report found these findings unchanged: nurses and clinicians still failed to identify when patients required emergency services, there were no written policies on when

64

infirmary capabilities were exceeded, and multiple failures to refer to higher levels of care resulted in patient deaths. *Id.*; *see also* Ex. 34 at 19-20 (*Johnson*, 23-cv-1234, Dkt. 285) (relying on *Lippert* reports as additional evidence of notice for *Monell* claim at summary-judgment).

Moreover, Wexford's own corporate representative, Dr. Neil Fisher, admitted under oath that Wexford did not develop specific guidelines to address the chronic failure to contact higher-level clinicians when patients presented with acute symptoms. PSOFW ¶ 120. And the Quality Improvement Reviews at Taylorville during 2021 paint an equally stark picture of deliberate indifference. There was no full-time physician at Taylorville during 2021. PSOFW ¶¶ 126-57. The Medical Director position was vacant for over a year. PSOFW ¶ 139. Defendant Duncan filled in for on-call shifts at Taylorville in the absence of a medical director, and responded by phone to Mr. Eastman's emergency on April 9. PSOF ¶ 74. Defendant Ducan's indifference in Eastman's care was not an isolated event for Dr. Duncan. PSOFW ¶¶ 154-56. Wexford had ample notice of Defendant Duncan's years of persistent failures that are exactly consistent with the failures the *Lippert* monitor found, and that were present in Mr. Eastman's case, but Wexford never stopped him. *Id.*; *Watkins v. Ghosh*, 2011 WL 5981006, at *8 (N.D. Ill. Nov. 28, 2011) (failure to take corrective action to ameliorate staffing deficiencies indicative of Wexford's deliberate indifference).

This evidence plainly creates a genuine dispute of material fact as to whether Wexford was deliberately indifferent to a known risk of constitutional violations. *See Daniel v. Cook County*, 833 F.3d 728, 735-36 (7th Cir. 2016) (deliberate indifference established where municipality had notice of deficiencies and failed to act). Summary judgment should be denied.

65

IV.     **Contrary to Wexford's Contention, *Monell* Liability Does Not Hinge on Individual Liability**

Wexford also argues that Plaintiff's *Monell* depends on establishing the individual defendants' liability. Although this Court need not reach this argument because Plaintiff has provided more than sufficient evidence of Defendants' deliberate indifference, it is in any event meritless and relies on a fundamental misreading of binding precedent. *See generally* Dkt. 149.

As the Seventh Circuit has explained, a municipality—or a private entity acting under color of state law—can be liable under *Monell* even when individual officers or employees are not, where the plaintiff's theory is that systemic breakdowns, rather than a single individual's constitutional violation, caused the harm. *See Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 305 (7th Cir. 2010) (rejecting municipality's contention that an individual officer must be liable "before a municipality can ever be held liable for damages under *Monell*"). Indeed, *Thomas* was clear, "a municipality can be held liable under *Monell,* even when its officers are not." *Id.*

Here, Plaintiff has established underlying constitutional violations by multiple individual defendants. Yet her *Monell* theory does not necessarily rise or fall with any particular individual's liability. Rather, a reasonable jury could also conclude that Wexford's systemic failures created the conditions that caused Mr. Eastman's death. These systemic deficiencies—along with the indifference of various members of Wexford's medical staff—killed Mr. Eastman. *See Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020) ("Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two."). The Court should reject Wexford's argument on this score.

66

### V.        Summary Judgment Is Not Warranted on Plaintiff's State-Law Claims

Wexford also seeks summary judgment on Plaintiff's state law claims for wrongful death and the survival action—premised on Wexford's incorrect assertion that the Individual Defendants are entitled to summary judgment. To start, the Individual Defendants did not seek summary judgment on Plaintiff's Survival Act claim; Wexford is thus not entitled to summary judgment because Plaintiff's respondeat superior theory of liability necessarily remains viable. *See* Dkts. 128 and 133. And notably, Wexford also does not seek summary judgment as to that claim for Wexford's institutional negligence. Accordingly, the Survival Act claim survives on that basis, too.

As to the wrongful death claim, Plaintiff incorporates by reference her response in opposition to the same in response to the Individual Defendants' Motion for Summary Judgment. Dkt. 149 at 108. If any of the claims against the Individual Defendants survive, as they should, so should Plaintiff's wrongful death claim against Wexford. *See Reed v. Wexford Health Sources, Inc.*, 2021 WL 673370, at *3 (S.D. Ill. Feb. 22, 2021) ("The claim of *respondeat superior* liability against Wexford pursuant to Illinois state law shall proceed.").[3]

### CONCLUSION

For these reasons, Wexford's motion for summary judgment should be denied.

---

[3] Wexford references Count VII of the Complaint to suggest that Plaintiff is attempting to resurrect that claim through her Monell theories. Dkt. 249 at 2, 36–37. In Count VI, liability under 42 U.S.C. § 1983 was pleaded in the alternative to the Monell claim, based on a good-faith argument for extending the law of corporate liability under § 1983. Plaintiff reserves the right to ask the Seventh Circuit to revisit this question but has already consented to dismissal of Count VI under existing Circuit precedent. *See* Dkt. 34 at 8-10.

Respectfully submitted,
/s/ David Schmutzer
David Schmutzer
Attorney for Plaintiff

Sarah Grady
Jed Glickstein
David Schmutzer
Amelia Caramadre
Annie Prossnitz
KAPLAN & GRADY
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2184
david@kaplangrady.com

68

## CERTIFICATION OF COMPLIANCE WITH TYPE/VOLUME LIMITATION

Pursuant to CDIL-LR 7.1(B)(4), 7.1(D)(1)(c), and 7.1(D)(5), the undersigned counsel certifies that Plaintiff's Response in Opposition to Defendant Wexford's Motion for Summary Judgment complies with the Type Volume Limitation set forth in the Central District Local Rules. The argument section of Plaintiff's Response consists of 4,617 words. In determining word count of the document, the undersigned counsel relied on the word, character, and line count functions of the word-processing system used to prepare the document.

## CERTIFICATE OF SERVICE

I, David Schmutzer, an attorney, hereby certify on July 13, 2026, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.


/s/ David Schmutzer
David Schmutzer
Attorney for Plaintiff