E-FILED
Monday, 13 July, 2026  08:40:06 PM
Clerk, U.S. District Court, ILCD

# Exhibit 24

# CASE NO. 22-CV-3052-CRL-DJQ

# JANET BEPPLER, AS ADMINISTRATOR OF THE

# ESTATE OF JEFFREY EASTMAN

# V.

# WEXFORD HEALTH SOURCES, INC., ET AL.

# DEPONENT:

# DR. NEIL FISHER ON BEHALF OF WEXFORD

# HEALTH SOURCES, INC.

# DATE:

# August 15, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

HON. COLLEEN R. LAWLESS, JUDGE

HON. DOUGLAS J. QUIVEY, MAGISTRATE JUDGE

CASE NO. 22-CV-3052-CRL-DJQ

JANET BEPPLER, AS ADMINISTRATOR OF THE

ESTATE OF JEFFREY EASTMAN,

Plaintiff

V.

WEXFORD HEALTH SOURCES, INC., ET AL.,

Defendants

DEPONENT:  DR. NEIL FISHER ON BEHALF OF WEXFORD

HEALTH SOURCES, INC.

DATE:     AUGUST 15, 2025

REPORTER:  TALIA JACKSON

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, JANET BEPPLER, AS
ADMINISTRATOR OF THE ESTATE OF JEFFREY EASTMAN:

Annie Prossnitz, Esquire

Sarah Grady, Esquire

Amelia Caramadre, Esquire

Kaplan & Grady, LLC

2071 North Southport Avenue

Suite 205

Chicago, Illinois 60614

Telephone No.: (312) 852-2184

E-mail: prossnitz@kaplangrady.com

sarah@kaplangrady.com

amelia@kaplangrady.com

(Appeared via videoconference)

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, WEXFORD HEALTH SOURCES,
INC., GEORGE DUNCAN, AMBER BRAUN, CHELSEY DAVIS, CAROL
MANSFIELD, T. MARTY, AND PERCY MYERS:

Joe Rupcich, Esquire

Cassiday Schade, LLP

2040 West Iles

Suite B

Springfield, Illinois 62704

Telephone No.: (217) 993-5644

E-mail: jrupcich@cassiday.com

(Appeared via videoconference)

Page 4

INDEX

                                           Page

DIRECT EXAMINATION BY MS. PROSSNITZ        7

CROSS-EXAMINATION BY MR. RUPCICH           27

REDIRECT EXAMINATION BY MS. PROSSNITZ      48

EXHIBITS

Exhibit                          Page

8 - Portion of Lippert Report

  (P008563-P008565)                     9

9 - Excerpts from the 2014, 2018, and 2019

  Consent Decree Cited in Topic 15 of the

  30(b)(6) Deposition Notice          50

Page 5

STIPULATION

The REAL VIDEO 30(b)(6) deposition of DR. NEIL FISHER was taken at CHURCHILL REPORTING, 110 NORTH WACKER DRIVE, SUITE 2500, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on FRIDAY, the 15TH day of AUGUST 2025, at 1:01 p.m. (CT); said deposition was taken pursuant to RULE 30(b)(6) OF THE FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that TALIA JACKSON, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness.

3:22-cv-03052-CRL-DJQ    #150-25    Filed: 07/13/26    Page 5 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2025
30(b)(6)                                                                6..9

Page 6

PROCEEDINGS

THE REPORTER: My name is Talia Jackson. I'm the online video technician and court reporter today representing Churchill Reporting located at 110 North Wacker Drive, Suite 2500, Chicago, Illinois 60606. Today is the 15th day of August 2025, and the time is 1:01 p.m. Central. We are convened by video conference to take the deposition of Dr. Neil Fisher in the matter of Janet Beppler as administrator of the estate of Jeffrey Eastman v. Wexford Health Sources, Inc. et al, pending in the United Source – in the United States District Court for the Central District of Illinois, Case Number 22-CV-3052-CRL-DJQ.

Will everyone, but the witness, please state your appearance, how you're attending, and the location you're attending from, starting with Plaintiff's Counsel?

MS. PROSSNITZ: Yes. This is Annie Prossnitz, representing Plaintiff in this matter, attending remotely via Zoom from Washington, D.C., and I'm joined by my colleagues on the Zoom, Amelia Caramadre and Sarah Grady.

MR. RUPCICH: I'm Joe Rupcich. I represent the

Page 7

defendants. I'm in Springfield, Illinois.

THE REPORTER: Thank you, Counsel. Dr. Fisher, could you please state your name for the record?

THE WITNESS: Dr. Neil Fisher.

THE REPORTER: Thank you. And, Counsel, are we all in agreement that the witness is, in fact, Dr. Neil Fisher?

MS. PROSSNITZ: Yes.

MR. RUPCICH: Yes.

THE REPORTER: All right. Then, Dr. Fisher, can you please raise your right hand for me? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you, sir. And, Counsel, you may begin.

DIRECT EXAMINATION

BY MS. PROSSNITZ:

Q. Okay. Good afternoon, Dr. Fisher. My name is Annie Prossnitz, and I represent Plaintiff Janet Beppler in this matter. I am going to pull up what was marked as Exhibit 2 in the first deposition in this case.

MS. PROSSNITZ: And for the record, this is the Deposition Notice with the topics outlined, Notice

Page 8

of Rule 30(b)(6) Deposition.

BY MS. PROSSNITZ:

Q. I'd like to direct your attention to topic 15, which is highlighted. Dr. Fisher, are you aware that Wexford has designated you to provide testimony on topic 15 today?

A. Yes. And I have a printed copy of number 15 in front of me.

Q. Okay, great. And are you ready and willing to provide testimony on topic 15 today?

A. I am.

Q. Okay. Sir, did you review the 2018 Lippert Report in preparation for today's deposition?

A. Yes.

Q. Okay. And did you review the 2019 Consent Decree in preparation for today's deposition?

A. Parts of it, yes.

Q. Okay.

A. And I would say that for the 2018 report, I also reviewed parts of it. The parts that were particularly designated in the notice.

Q. Okay. Okay. That's fair. So I will pull up on the screen what will be marked as Exhibit 8. This is a portion of that 2018 Lippert Report. And the Bates Stamp is P8563 to P8565, which was designated an R

Page 9

30(b)(6) Notice. So as you'll see on the first page, this is the part of the Lippert Report dedicated to urgent and emergent care. Could you read to yourself that sentence I've highlighted under "First Court Expert Findings" and let me know when you're finished?

(Exhibit 8 was marked for identification.)

A. Yes, I have read it.

BY MS. PROSSNITZ:

Q. Okay. Sir, so according to this, the Lippert experts found in 2014 that nurses and clinicians failed to identify when patients required emergency room services and/or hospitalization; is that correct?

A. That is a statement within this 2018 document. Wexford and IDOC prepared an elaborate response, a 41-page response to the 2014 draft report from Dr. Shansky. And we did not agree with many of the final findings that were in the 2014 report. But IDOC and Wexford did agree with some of the findings within the 2014 report.

Q. Okay. And I'm just asking for purposes of this deposition, whether you would agree that the 2000 - - the experts found in 2014, that nurses and clinicians had failed to identify when patients required emergency room services?

A. That was -- I don't know if that exact line was in there, but a similar theme certainly was in the

3:22-cv-03052-CRL-DJQ   #150-25   Filed: 07/13/26   Page 6 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2025
30(b)(6)                                                                    10..13

Page 10

2014 report, which IDOC and Wexford responded to.

Q. Okay. So, moving to the current findings in this 2018 report. Can you see that on your screen?

A. Yes.

Q. Okay. And I will read that into the record. It says, "Our findings are unchanged from those of the first court experts. Among charts reviewed that were obtained from lists of patients sent to the ED, seen in sick call, chronic care clinics, specialty care, and hospitalizations. We found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician, patients returning without records from the offsite provider, failure to assess patients upon their return from offsite care, and lack of appropriate follow-up by the primary care provider." Do you see that?

A. Yes.

Q. Okay. And do you understand this to mean that the Lippert experts found in 2018 that nurses and clinicians were still failing to escalate cases for patients in need of emergency care in IDOC?

A. Well, I think it's important where it says, "Here are a few recent examples," and they actually only give three examples, so -- and again, the Lippert monitors in 2018 only went to five sites. Dr. Shansky

Page 11

had gone to eight sites. So it's a very limited number of sites that the -- Dr. Puisis and his team actually reviewed in 2018.

Q. Okay, sir. So I'm not asking if you agree with the statement. I'm just asking if you understand the statement to mean that the Lippert experts found, in 2018, that clinicians were failing to escalate cases for patients in need of emergency care at IDOC. Do you understand the report to be saying that?

A. Well, what it's stating here is, "incomplete nursing assessments, failure to contact higher-level clinicians, patients returning without records, failure to assess patients upon their return from offsite care, and lack of appropriate follow-up by the primary care provider." So I'm not sure that matches what your question stated.

Q. Okay. Do you understand failure to contact a higher-level clinician to mean that Lippert experts found in 2018 that clinicians at IDOC were failing to contact higher-level clinicians about patients in need of care?

MR. RUPCICH: I object to the form. I think -- Counsel, I think you meant nurses were not -- did you mean to ask -- you said clinicians not contacting clinicians. You mean to say nurses not

Page 12

contacting clinicians?

MS. PROSSNITZ: Yes. Nurses not contacting --

MR. RUPCICH: Okay. Do you want -- do you want to -- you want to just go ahead and re-ask that, so we get it clear.

MS. PROSSNITZ: Sure. Okay.

BY MS. PROSSNITZ:

Q. I'm asking, do you understand this statement in the report to mean that the 2018 Lippert experts found that nurses were failing to contact higher-level clinicians for patients who were in need of a higher level of care at IDOC?

A. Well, recognizing they only went to five sites, there is a line in here stating "we," meaning the experts, "found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician."

But again, there are only three examples that are in the report in this section. They did not go to all the different sites, and Wexford was also not given the names of these -- or IDOC was not given the names of these individual patients, so we could research it independently.

Q. Okay.

A. But I do see where it says that line there.

Page 13

Q. Okay. So that's my question, not -- and we will get to whether you agree with this assessment in a second. But just whether you understand the report to have that finding that I described.

A. It -- it does state they found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician.

Q. Okay. So moving on, was Wexford concerned between 2018 to 2021 that nurses and clinicians were failing to identify patients in need of emergency care IDOC?

MR. RUPCICH: Object to vague. Subject to that.

THE WITNESS: Again, these are individual clinical situations. There are IDOC nursing treatment protocols that were encouraged to be utilized by Wexford nursing staff. Remember that some of these sites have a mixed staff of nursing, both IDOC and Wexford. So, without having the names of the individual patients, there was no way to research whether this was an IDOC nurse or a Wexford nurse that they were referencing as possibly an example.

BY MS. PROSSNITZ:

Q. Okay. So, taking your attention away from

3:22-cv-03052-CRL-DJQ    #150-25    Filed: 07/13/26    Page 7 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2023
30(b)(6)                                                                    14..17

Page 14

those specific examples, just generally, was Wexford concerned -- was it a concern of Wexford's between 2018 to 2021, that nurses and clinicians were failing to identify patients in need of emergency care?

MR. RUPCICH: I object to foundation.

THE WITNESS: Again, what it's saying here is about nurses. It's not mentioning clinicians in this section (Inaudible).

BY MS. PROSSNITZ:

Q. Okay. So I'm asking you not to refer to the report in this question, and asking was this a concern of Wexford's between 2018 to 2021, we'll start with that nurses were failing to identify patients in need of emergency care.

A. Well, we --

Q. Was that a concern of Wexford's?

A. Well, we -- we would want them to utilize their judgment, but also utilize the nursing treatment protocols that the IDOC provides, which helps provide guidance related to when to contact a clinician. But of course, using their training also to, even if it doesn't state that -- to contact a clinician, we would want them to use that independent judgment. We do have lots of training that occurs among our nursing staff.

That training is also shared for IDOC nursing

Page 15

staff related to assessing patients. So it's definitely something that we want to encourage the communication when appropriate.

Q. Okay. But did Wexford think it was an issue that nurses were failing to identify patients who were in need of emergency care between 2018 to 2021?

MR. RUPCICH: Object to foundation.

THE WITNESS: Again, there are three examples here, and the three examples cover all of these topics, and we had no way of independently researching these three examples. But of course, if Wexford itself is finding that there was a case where we don't think that communication was well done, those are issues we would want to bring forward.

Remember that there are multiple individuals looking at a medical record, some of those are IDOC, some of those are Wexford Health Sources individuals, either at the site level or regional level, or at times the corporate level. And if we are finding something that we do not feel is correct, either from the IDOC nursing side or from the Wexford nursing side, that is something we would want to bring forward.

BY MS. PROSSNITZ:

Page 16

Q. Okay.

A. And we would bring forward.

Q. Dr. Fisher, did Wexford do anything to investigate the findings of this report -- or I should say -- strike that. Did Wexford do anything to investigate the findings as related to emergency care, as described in this statement that's highlighted?

A. Well, it's -- again, where it says, "we found numerous instances of" -- and it gives you a different setting, they only give three examples, and we were not given the names at that time. Wexford and IDOC were given the names of these individuals years after this report came out, years. So we did not have a way of identifying these patients.

But we still encouraged our regional medical directors when they were going on to a site and something was identified as a particular site to try to figure out who these patients were with their medical directors and look at the cases, if it was possible for them to figure out who this patient was. But again, without an electronic health record in IDOC, figuring out what happened, as an example, 1-22-18, this one was possible because it's a female, and the female sites did have an electronic health record.

But the male sites did not have an electronic

Page 17

health record at this period of time, and still do not. So it would be very hard to research something like that.

Q. Okay. So, is that a no? Wexford didn't investigate these examples that are listed underneath the current findings?

A. I didn't state that.

Q. Okay. Did Wexford investigate these specific examples that are listed under current findings?

A. Wexford corporate staff in -- in coordination with their regional staff, encouraged the regional staff to try to figure out who these patients were and if there was anything within here we could learn from or possibly dispute. But again, we were not given the names at the time of this report, and we did not get the names until years later. But we still encouraged our management team in Illinois to try to research these, if possible.

Q. And what were the results of this research? Did Wexford agree with these findings ultimately, or was there anything to dispute?

A. I did not do -- I was part of the team that was instructing our regional directors to try to research these. But I don't remember personally any type of response related to these, if they were actually

Page 18

able to determine who these patients were.

Q. Okay.

A. So I don't personally remember. There may have been someone else who was informed, but I was not part of -- of the group that would've been typically informed. That would've been typically our -- our corporate medical director.

Q. Okay. And did Wexford do anything to address the finding that clinicians and nurses were failing to identify patients in need of emergency care between 2018 and 2021?

A. Hello?

Q. Yes. Can you hear me?

A. Yeah. You -- you stopped in the middle of your sentence, I -- it broke up.

Q. Okay. I apologize. Did Wexford do anything to address the finding of the 2018 Lippert Report that nurses and clinicians were still failing to identify patients in need of emergency care at IDOC?

A. Again, this section here does not mention clinicians failing to escalate. This particular section is talking about nursing.

Q. Okay. So let me back up. This section, you'll agree, says, "our findings are unchanged from those of the first court expert," correct?

Page 19

A. Yes.

Q. Okay. And then we go to -- back to the first page under "First Court Expert Findings: Findings of the first court expert for this service, where that nurses and clinicians failed to identify when patients required emergency room services and/or hospitals." That's what that says, correct?

A. Yes.

Q. Okay. So do you dispute that the finding would -- do you not understand this statement, "our findings are unchanged" to mean that in 2018, the findings remained that nurses and clinicians were failing to identify patients in need of emergency care?

A. I -- I would -- I can't say what the actual experts meant by that particular line when they have a more detailed line after it that talks about different items. So, whether they actually meant that particular line, that would be a question for the Court monitors.

Q. Okay, sir, and I'm not -- I'm not asking what they meant. I'm asking what your understanding is.

A. I -- I'm reading it as what it states here. "Among charts reviewed, were obtained from lists of patients sent to the ED, seen in sick call, chronic care clinics, specialty care, and hospitalization." And they say what they found numerous instances of, "incomplete

Page 20

nursing assessments and failure to contact a higher-level clinician, patients returning without records from the offsite provider, failure to assess patients upon their return from offsite care, and lack of appropriate follow-up by the primary care provider." And they give a few recent examples.

Q. Okay. So let --

A. So in this particular section, it's not mentioning the clinician. I agree with you that that first section mentions also clinicians, but this particular section, I don't think, is referencing clinicians the way you are.

Q. Okay. So let's just take failure to contact a higher-level clinician. Did Wexford do anything in response to that finding of the 2018 Lippert experts that there was a failure to contact higher-level clinicians at IDOC, specifically in the timeframe of 2018 to 2021?

A. Again, as I've mentioned beforehand, this is talking about nursing and the monitor's perception of failure to contact a higher-level clinician. They only give three examples. We were not able to review those three examples at the time at -- in -- of -- during this draft report, unless there was a way to possibly track these patients down.

Page 21

But in all times, we would certainly, if any Wexford staff member or IDOC staff member identifies a time when they feel that there was incomplete nursing assessments and failure to contact a higher-level clinician, if either team identifies something like that, this is something that would be very important to bring forward.

So individual circumstances are brought forward, and education or counseling, or possibly even termination, may occur related to that. But this is, again, a very important item, but we're looking at individual cases. And, if any team member on either side identifies something, that's something could that can be brought forward and should be brought forward.

Q. Okay. But did Wexford issue any guidelines or new policies in response to the finding that there was a failure to contact higher-level clinicians on the part of the Lippert experts in 2018?

MR. RUPCICH: Object to foundation.

THE WITNESS: Again, the sick call process is an IDOC process. There are IDOC nursing treatment protocols that nurses use in IDOC. It's an IDOC process, and the IDOC forms are quite clear in many situations of when to contact a higher-level clinician.

3:22-cv-03052-CRL-DJG #150-25   Filed: 07/13/26   Page 9 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2023
30(b)(6)                                                                    22..25

Page 22

So, although the experts are recommending that they say they found numerous instances of this, without having the examples, it makes it very challenging to see what they are determining as this -- the numerous instances.

BY MS. PROSSNITZ:

Q. But are you aware of IDOC then changing any of its directives and to -- regarding failures -- failure to contact higher-level clinicians between 2018 and 2021?

A. I can't be aware of all the processes of IDOC and whether -- what IDOC did on their behalf. But again, this is something that we would continue to work with our client on related to. So yes --

Q. Okay.

A. -- it's -- it's an important topic.

Q. But you can't think of any specific directives or guidelines that came down to address failure to contact higher-level clinicians between 2018 to 2021; is that correct?

A. There was always training during this period of time, training for nurses. As I mentioned with training, the training is on a variety of different topics. Treatment protocols is one of the topics. So there is ongoing training that is for Wexford nurses,

Page 23

actually required training that is completed through our core educator system.

Q. Okay. And was there any training that was changed to address the issue that the Lippert experts found, that there was a failure to contact higher-level clinicians in IDOC following 2018?

A. I had meetings with our leadership of IDOC in preparation for this deposition. I didn't ask them that particular question if they could recall that specific fact. So I don't personally know, but there -- there may be a different answer from ID -- from Wexford's leadership in the Illinois contract.

Q. Okay. But you don't know of any as you sit here today; is that fair?

A. I'm saying I don't personally know. But there may be individuals within Wexford who do have knowledge of something specific if there was outside of our regular training.

Q. Okay. Are you aware of any clinicians or nurses who were removed or disciplined in response to this particular finding of the 2018 Lippert Report?

A. I don't have that personal knowledge. I did not ask that question of anyone at Wexford or of our Illinois leadership team. So I don't have that personal knowledge.

Page 24

Q. Okay. And I'll just ask again: Was it a concern of Wexford's following this report in 2018 to 2021, that there was a failure to identify patients in need of emergency care at IDOC?

MR. RUPCICH: Object to the foundation.

THE WITNESS: It doesn't say that there. It says, "We found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician." So that doesn't mean it was happening 100 percent of the time; they just found numerous instances. But again, we don't know what all those instances were; we weren't given that list of patients as Wexford or IDOC.

BY MS. PROSSNITZ:

Q. Okay. And just drawing your attention away from the text that's on the page, I'm asking if this was a concern of Wexford's in 2018 to 2021, that generally there was an issue with nurses and clinicians failing to identify patients who needed emergency care? Yes or no?

MR. RUPCICH: Object to foundation. Object to foundation. Assumes facts.

THE WITNESS: Yeah. That was a confusing question for me. Can you possibly repeat it?

BY MS. PROSSNITZ:

Q. Yes. I'm asking, drawing your attention away

Page 25

from the report, if generally it was a concern of Wexford's between 2018 to 2021, that there was a problem with nurses and clinicians who were failing to identify patients in need of emergency care?

MR. RUPCICH: I'll object to compound and lacking in foundation for the conclusions built in. Go ahead.

THE WITNESS: There was a lot in that question. In -- in reference to Wexford is always looking at quality improvement along with our client, they -- so if there is an issue that is brought forward, this is something that would be addressed.

BY MS. PROSSNITZ:

Q. Okay. So is it fair to say that the failure to identify patients in need of emergency care is always a concern of Wexford's?

A. Each case is uniquely different, so I can't speak related to all cases. So it's --

Q. I'm not asking in related to all cases. I'm asking, generally, if Wexford found that this was an issue, a pervasive issue at IDOC between 2018 to 2021?

A. I -- I'm not even reading in this report that it's saying, "a pervasive issue." They're saying they found instances of this, but that's not saying pervasive issues.

3:22-cv-03052-CRL-DJO   DR # 150-25   Filed: 07/13/26   Page 10 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2025
30(b)(6)                                                                    26..29

Page 26

Q. Okay. So, understanding the findings of the first court to mean -- or to be that there were nurses and clinicians failed to identify when patients required emergency room services and/or hospitalizations. I'm just asking based on that understanding of that was that a concern of Wexford's in 2018 to 2021? That this was an issue at IDOC.

MR. RUPCICH: Object to vague and lack of foundation.

THE WITNESS: The 2014 report, Wexford and IDOC, was given the names of the patients, and we did - - Wexford did an aggressive review of medical records to respond to the draft 2014 report. And so -- but -- and we found that there were many cases that we did not agree with the reviewers' comments, so -- but there were times when we did agree with the reviewers' comments and there's -- there are some clinicians who are no longer with us because of things that we found during earlier reviews or reviews that occurred after that 2014 report.

BY MS. PROSSNITZ:

Q. Okay. And did Wexford agree with this finding of the 2014 report?

A. Again, we have a very detailed written response to the 2014 report that was constructed in

Page 27

combination with IDOC. So I would -- I would review the wording of that as the answer to that question, because I think that helps to state items that we found out by reviewing the cases of the 2014 report.

Q. Okay. And based on your familiarity with Wexford's response, are you aware, as you sit here today, of what the response was? In response to this finding, I mean.

A. This particular line, I -- I did not remember reviewing this particular line of the 2014 response. I did look at the 2014 response from IDOC to the draft report, from the 2014 report. And there were -- it's a 41-page report, I did not remember all the different sections of exactly what was stated.

MS. PROSSNITZ: Okay. That's fair. I think that is all my time for this deposition, but I appreciate your time, Dr. Fisher.

CROSS-EXAMINATION

BY MR. RUPCICH:

Q. I have a couple questions. Dr. Fisher, you were asked just now a series of questions about IDOC's and Wexford's actions taken in response to opinions of the Lippert court Monitors. Do you recall that?

A. Yes.

Q. Can you explain Wexford's understanding of its

Page 28

role in the Lippert litigation?

A. Well, there was one Wexford individual who was initially named within the -- the actual complaint. Wexford was removed from that case in -- I believe in December of 2013. But again, we continued to work closely with our client, the Illinois Department of Corrections, in responding to where this litigation was going.

Q. And over the course of that litigation, did Wexford continue to have a role in assisting the department as it related to issues that came up in the Lippert litigation? If so, how did it do that?

A. Yes. But recognizing that the operations of IDOC those are the administrative directives and institutional directives, so there are items that were outside of Wexford's control. We could not control the ADs and IDs in Illinois. Similarly, we could not control some of the reports about cleanliness and, you know, lack of -- dirty laundry. Those are not things that were in Wexford's control.

But there were things that were within Wexford's control and that were also within IDOC's control, and we continued to work closely together to try to respond related to this ongoing litigation.

Q. So if I'm understanding you, sort of the

Page 29

administrative framework for the delivery of healthcare Services in Illinois was the department's rules. Is that a fair statement?

A. Yes.

MS. PROSSNITZ: I would object. Beyond the scope of the direct. But go ahead.

THE WITNESS: Yes. So, in -- we actually had originally out -- Wexford operations guidelines in the 2014, 2015, that -- that were specific to the regional Illinois in the 2014-2015 timeframe, we actually made a decision to remove Wexford's operations guidelines because they were causing confusion in reference to which guidelines were the ones to follow. And for the operational procedures, the administrative directives and institutional directives of the Illinois Department of Corrections are the ones guiding operational processes.

BY MR. RUPCICH:

Q. You also mentioned things such as cleanliness, plant space, equipment, those type of things. To the extent those were raised by the Lippert expert Monitors, what's Wexford's view of its ability in -- to address issues like that?

MS. PROSSNITZ: Same objection.

THE WITNESS: Well, we did have -- after the

Page 30

2014 report, there were -- meetings were developed between Wexford and IDOC, meetings were developed that discussed staffing. These were ongoing meetings that initially started as two times a month, and then went to one time per month. We also had, just in reference to different Lippert topics, we had a different meeting with IDOC, and attorneys that were representing IDOC were on both of these calls in reference to items to discuss.

So if we were having an issue with something like cleanliness or security or an -- an equipment problem that was not a medical equipment issue, these are things that would be discussed regularly during these monthly calls with our client, but also the attorneys for the Lippert case. So this is a way that Wexford could bring things forward.

BY MR. RUPCICH:

Q. And am I understanding you that these calls went on for the duration of the Lippert litigation on either a bimonthly or monthly basis?

A. Yes.

MS. PROSSNITZ: Objection to form.

THE WITNESS: Yes.

BY MR. RUPCICH:

Q. And am I understanding you that these calls

Page 31

provided a forum for issues that came up in the Lippert litigation that may impact the delivery of healthcare services to be discussed among the Wexford and IDOC staff?

A. Yes. Of course, if there was a topic that wasn't mentioned in Lippert but also was a pressing topic for Wexford, it also gave time for those type of discussions, also.

Q. Does Wexford have an understanding of what the result of the Lippert litigation was?

A. Yes. We are aware there was a Consent Decree in 2019 that IDOC agreed to with the -- the IDOC's attorneys agreed to with the plaintiff's attorneys.

Q. And that Consent Decree was the result of the years of Lippert litigation, the multiple Monitor reports, eventually culminated in this negotiated settlement. Is that your understanding?

A. That's my understanding. And of course, there's ongoing monitoring that is occurring as part of that also. And Wexford does review those ongoing monitoring reports also.

Q. One of the topic -- subtopics that was noticed in this, and we can certainly --

MR. RUPCICH: Annie, if you want to put up Exhibit 2 again, if you don't mind. I don't have it

Page 32

handy.

BY MR. RUPCICH:

Q. Within Topic 15, I believe Ms. Prossnitz asked you about P8563 to 8565. I'd like to ask you about P8500 to P8503, which was 2014 Lippert Monitor recommendations on continuous quality improvement. Can you explain Wexford's role in the continuous quality improvement program in Illinois?

A. As part of the operations of Illinois, the Illinois Department of Corrections organizes and controls the quality improvement program, the Illinois Department of Corrections. Wexford does participate in those meetings. Senior staff at a site would attend a site CQI meeting. Also, typically with a site-level CQI meeting would be the regional manager that's assigned to that site, would typically attend.

Also, the regional medical director, if they were available to attend for that particular site, would also typically attend those monthly meetings. But it's an IDOC process. Wexford has a quality process where we do our quality scorecards, and there were times when IDOC allowed that, and there were times when IDOC did not want the Wexford process to occur. But the main CQI program is an IDOC program.

Q. Insofar as the Lippert Monitors recommended

Page 33

changes to the IDOC CQI process, who would have to make such changes?

A. That would be the IDOC that would be making those changes related to their processes.

Q. Okay. I want to ask you about P8482 to 8485. And you had a chance, Doctor, to review these specific sections of the Lippert Reports as you said earlier, true?

A. Yes. It might be helpful to actually have them up.

Q. Of course.

A. During the -- the time when you questioned me about it.

Q. Let me -- let me share. Where did it go? Are you able to see my screen?

A. Yes.

Q. Okay. You were -- Wexford was asked a topic about response to the Lippert Monitor 2014 opinions on unscheduled onsite and offsite services. Do you see that?

A. Yes.

MS. PROSSNITZ: Objection to form.

BY MR. RUPCICH:

Q. Okay. Did you -- and you had a chance to review this section of the Lippert Report?

3:22-cv-03052-CRL-DJO DR # 150-25 Filed: 07/13/26 Page 12 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2025
30(b)(6)
34..37

Page 34

A. I did.

Q. What was Wexford's response to the question about the Lippert Monitor's criticisms, opinions on unscheduled onsite and offsite services? What was Wexford's response to this?

MS. PROSSNITZ: Objection to form.

THE WITNESS: Again, to the 2014 report, there was a 41-page combined report that the IDOC sent to the Monitors, that Wexford was very involved with development of that report. And there were -- there was a lot of detail put into that report, recognizing the individual sections that the monitors had mentioned.

And so we did the review based on having access to the patient names. And there were times when we did agree with what the assessment was, and there was times we did not agree with the assessment. But also recognizing that many of these -- most of these processes are covered by IDOC and how they do things. It's mentioning about the log, that not having a log related to unscheduled onsite and offsite services.

In this case, we actually shared with IDOC our utilization management log that we use on the Wexford side, so they could have the healthcare unit

Page 35

administrator, who's an IDOC employee, actually use that to start this process for patient identification, date, time, and for the different items.

That was later customized by IDOC, that electronically completed log, so that it could be utilized to help address one of the items put forward in here about not having a log. Also, in reference to patients coming back from the hospital and not having emergency room paperwork, from a patient who went urgently to the emergency room and comes back, or not having, if the person went to the emergency room and was admitted, not having the discharge summary.

We went into quite a bit of detail about how both IDOC and Wexford are not in control of the process of an outside hospital's process. So, as an outside hospital's process, we certainly encourage the outside hospital process to understand corrections and that these patients coming back with just patient discharge information was something that would be challenging for onsite clinician staff to understand what really happened.

But we also mentioned in that -- that 2014 report about if someone is admitted, we have

Page 36

inpatient nurses that follow the patient during their inpatient stay and are regularly communicating with the IDOC and Wexford staff at the site about what's happening with that patient, and also helping to arrange a discharge plan. If a patient is discharged on an IV antibiotic that's not available at the site, if we know this is going to occur ahead of time, then we can arrange for that IV antibiotic or whatever medicine to be at the site for this continuity of care.

Also, with that continuity of care, there are some patients where they are above the level of care able to be provided at a particular site. And there are times when we arrange for that person to go to an acute care unit, a skilled nursing facility, something like that, recognizing what the site-level staff was. So there was a lot of detail put into that 2014 report saying there are things that we do encourage the hospitals to send information, but also recognize there are things that are outside of Wexford and IDOC's control.

But one of the things that Wexford did is that log that I earlier mentioned, that was from utilization management. We actually modified that log to include an extra column at the end, noting

Page 37

that the paperwork has returned. If that log, of course, is blank, that means we should still -- that medical records staff at the site should still be working towards trying to get that paperwork from the hospital. Particularly, hospital discharge summaries is one of the things that they are mentioning here.

A discharge summary is often not dictated by the hospital clinicians until sometimes days or even weeks later. So it would not necessarily be available right away. So it's something that we were continuously working on and trying to improve. And we encouraged our medical directors to become familiar with that log, and if there are blanks on that log, to certainly bring that forward, that we might -- to try to get paperwork back from the hospital or from the emergency room.

BY MR. RUPCICH:

Q. Okay. Thank you. The next subtopic was at Page 8573 of the 2018 Lippert Report, 8573 to 8581 on infirmary care. Did you have a chance to review that section of the 2018 report?

A. Yes.

Q. And the question was posed in the topic what Wexford's response to this particular section of the

3:22-cv-03052-CRL-DJO DR # 150-25 Filed: 07/13/26 Page 13 of 16
The Deposition of DR. NEIL FISHER, taken on August 15, 2025
30(b)(6)                                                                          38..41

Page 38

2018 Lippert Report was.

A. If you go down to the section of Current Findings, where it talks -- went too far.

Q. Oh, I'm sorry. Yep.

A. Yeah. Where it says, "The physical plants of the infirmaries were described in the section on clinical space and equipment."

Q. Yes.

A. "Which noted serious problems with level of cleanliness, lack of adjustable hospital beds, torn mattresses, non-functioning negative pressure units in isolation rooms. The absence or complete distribution of nurse call devices, and unsafe shower rooms in many of the infirmaries."

This is something that would be outside of Wexford's control. This would be under the control of IDOC, but we still chose to -- we still recognized that this was very important. Our vice president of operations, along with our vice president of special projects, which was involved with Lippert litigation, assigned our regional managers to go to the different sites that they were assigned to and actually look at the infirmary for items such as this.

So if we found that there were problems with cleanliness, negative pressure units not working, the

Page 39

things that are described here, those issues were brought up on those Lippert IDOC calls that also included the attorney -- attorneys representing IDOC in the Lippert litigation. So we were saying these are things that we found, these are not things that are under Wexford's control, but we still want to make sure we are bringing this forward, being the sort of eyes and ears.

Q. All right. Give me one second.

A. I can continue if you want.

Q. Oh, I thought you were done. Yeah. You can continue if you're not done with that topic.

A. Yeah. Well, it mentions, at the bottom of the page where you just were at, about the offender infirmary services administrative directive. They have a lot of issues with that administrative directive. Again, the administrative directive was the controlling directive related to infirmaries, and so Wexford did not have any control over that. In reference to -- continue.

They do a lot of discussion about some very challenging cases requiring a very high level of nursing care that was in a number of the infirmaries. It mentions that last paragraph on this page, mentioning "At the time of the expert site visits, a high

Page 40

percentage of patients in the infirmary were physically or mentally impaired with dementia, traumatic brain injuries, advanced cardiovascular disease, or cerebral vascular disease." And they continued to talk about this.

Certainly Wexford, as clinicians and Wexford staff, if that patient was in the infirmary, unless they required a higher level at the hospital, or was truly beyond the scope of the facility's nursing staff, and that person could go to an assisted living facility or something such as that, these are items that Wexford agreed with, that there were a number of these very challenging patients.

And of course, there were times when staffing adjustments were made related to some of these challenging patients that occurred, and the IDOC did end up developing the Joliet Treatment Facility. But that was not until much later, when that opened, which had a special mission related to these more complex patients.

And in terms of the patients they were mentioning, as I mentioned before, we did not have the names of the individual patients. So, unless our regional medical director, in combination with a site medical director, could figure out who that patient was, we had no -- at -- at the Wexford corporate level, we

Page 41

did not have that -- we were not given that list of names until years after the 2018 report.

Q. I would like to look at the 2019 Consent Decree that the plaintiff's topic references at Pages 9715 and 9716. Are you able to see that? It's Section G: Urgent Emergent Offsite Services?

A. Yes.

Q. Did you have a chance, Dr. Fisher, to review this Section G of the 2019 Consent Decree in preparation for the deposition?

A. Yes.

Q. And to be clear, when we're looking at this Consent Decree, this is the Lippert plaintiff's and the IDOC's essentially, settlement agreement of the Lippert case. Do you agree with that?

A. Yes.

Q. So the question is, and we can go through these one by one. You may have touched on some of them. Well, let me ask -- let me back up more generally, did Wexford continue to have a role in working with the DOC on the issues in the Consent Decree after the Consent Decree had been signed and filed?

MS. PROSSNITZ: Objection to form.

BY MR. RUPCICH:

Q. The implementation?

Page 42

A. Yes. We are a partner with IDOC, and of course, as a partner with IDOC on things that were under our control, that -- these are things that we would work on. Recognizing there were many items that were not within our control.

Q. Okay. And in looking at Page 9715 under G, Urgent Emergent Offsite Services, number 1, "Each facility, HCUA shall track all emergent urgent services in a log book, preferably electronic." Did Wexford have any role in the implementation of that element of the Consent Decree?

A. Again, we had an earlier, from the 2014 report, given them our version of an electronic log book that IDOC later customized, related to this. The HCUA, of course, is not a Wexford employee, so we did not have any control over the HCUA. But if any Wexford employee was asked to enter data related to urgent or -- emergent or urgent services, we encouraged our staff to participate in that. But the actual final logbook was an IDOC process.

Q. And number 2, "Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent." Does Wexford understand what that means? And if so, how is this accomplished?

MS. PROSSNITZ: Objection to form. Compound.

Page 43

THE WITNESS: It's a pretty vague statement, but again, the IDOC's nursing treatment protocols help LPNs and RNs to determine -- help to determine when a situation is urgent or emergent and need to contact a -- a clinician. They give guidance related to that.

We also, of course, are always doing ongoing training in reference to -- to make sure that our staff, our nursing staff, and our clinician staff is aware of urgent and emergent situations that may occur. There was regular emergency drills that occurred within IDOC that Wexford staff participated in to check processes related to responding to an emergency.

And of course, in -- in reference to clinician staff, it's having our clinicians recognize and -- and, of course, continuing medical education having access to up-to-date items such as that would help them if there's maybe a question. If a situation is urgent or emergent, they could have resources to look at or have continuing education related to. But again, it's that individual clinician's individual judgment at the time related to the clinical situation in front of them that they are -- that's being explained to them typically by a nurse.

Page 44

BY MR. RUPCICH:

Q. Does Wexford permit its nursing staff in Illinois to direct that 911 be called or emergency services be summoned in appropriate situations without first calling a clinician?

MS. PROSSNITZ: Objection to form. Outside the scope.

THE WITNESS: Yes.

BY MR. RUPCICH:

Q. Number 3: "IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained."

Doctor, think you've already addressed what was done in regard to this as a recommendation. Is there anything else you want to add regarding Number 3 in the Consent Decree?

A. To add to this in reference to within the 2018 report, there's discussion that IDOC should withhold payment if these documents were -- were not received. It's -- it's hard enough to get facilities to agree to see inmates. If you start withholding payment, that is not a good way to develop community relations related to this. But again, ongoing efforts related to our logbook was certainly an important aspect of it. And this is

Page 45

also mentioning the IDOC's role in trying to also assist with this process of obtaining not just patient discharge instructions, but the actual emergency reports, and IDOC shall use its best efforts.

I would say Wexford always uses its best efforts related to also getting these emergency reports.

Q. And Number 4 at Page 9716: "Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician, and the clinician shall implement necessary treatment." What was Wexford's role in this aspect of the Consent Decree?

A. Certainly, educating our clinicians, our medical providers, about this within the Consent Decree. We did go over the Consent Decree during the quarterly meetings that we had with our medical directors and supervisory staff within Illinois. So we did go over parts of it and explain things that were changes according to what happened within the Consent Decree.

This would typically have been covered in an AD related to this. I'm not certain that IDOC updated their AD with this specific information afterwards. But

Page 46

there was already some wording within the AD about the -- the need for follow-up after returning from offsite service. So there was already information, but I'm not sure that IDOC updated their AD related to this, but we did educate our staff, including our medical directors, related to this process that IDOC and the plaintiff's attorneys had agreed to.

Q. Doctor, are there -- based on the questions I've asked you about Wexford's role in conjunction with the IDOC related to the Lippert litigation, is there anything that I have omitted from asking that you would like to say about these topics that were noticed?

MS. PROSSNITZ: Objection to form. Over broad. Outside the scope.

THE WITNESS: I -- I would suggest going back to the 2018 Lippert Monitor opinion on urgent/urgent care that we discussed at the beginning. So 8563 to 8565. There were items that I noted in that that I thought were important.

BY MR. RUPCICH:

Q. I put 8563 urgent emergent care from the 2018 Lippert Report up. Do you see that?

A. Yes.

Q. There's something within this section that you wanted to highlight?

Page 47

A. Yeah.

MS. PROSSNITZ: Objection to form.

THE WITNESS: Well, we've talked about that first line of the first court expert finding. So we've talked about that.

In reference to the items that are underneath that first court expert findings, of course, there was the very detailed 2014 response from Wexford and IDOC -- from the -- that -- that Wexford was very involved with and helping to create that IDOC submitted to the Court monitors. But you can continue.

BY MR. RUPCICH:

Q. You want me to scroll down further?

A. Yeah.

Q. Yeah. Tell me (Inaudible).

A. I mentioned about the -- the challenges with the -- not knowing who these individual patients are. If you could continue. I think there was something else. Yeah, I -- I -- so again, the challenge was not knowing who the individual patients were. And as I've already mentioned about, there were only three examples given, yet there was, of course, multiple allegations from the Court Monitor.

MR. RUPCICH: Okay. I believe those are all my

Page 48

questions.

MS. PROSSNITZ: Okay. I just have a follow-up based on that.

MR. RUPCICH: Figure out a time, Counsel.

MS. PROSSNITZ: Would you allow me to ask one question based on your extensive questions, Joe, or are you going to object to that?

MR. RUPCICH: One question.

MS. PROSSNITZ: Okay. Thank you.

REDIRECT EXAMINATION

BY MS. PROSSNITZ:

Q. Sir, you were asked some questions about Wexford's involvement in the Lippert litigation. Do you recall that line of questioning?

A. Yes.

Q. Okay. And you responded that Wexford participated in calls with IDOC on the topic; is that correct?

A. Yes.

Q. Okay. And what was the content of those calls regarding providing urgent and emergent care to patients at IDOC facilities?

A. I was not personally on those calls. The individuals that briefed me on those calls and topics, I did not ask that particular question. So that would --

Page 49

there may be someone from Wexford who was on those calls that might be able to address that. But I was not personally on those calls.

MS. PROSSNITZ: Okay. Thank you, Dr. Fisher.

MR. RUPCICH: Okay. I have no other questions based on that. I think you typically waive signature, is that right, Doctor?

THE WITNESS: I do.

MR. RUPCICH: Okay.

THE REPORTER: Good to know. And then I just have a point of clarification. I know when we marked Exhibit 8, we only marked 8563 to 8565. But are we marking all those other sections of pages that we showed as well, or just that initial portion?

MR. RUPCICH: Well, why don't I -- yeah. Why don't we make it Exhibit 9, my excerpt, and I'll circulate it to everyone, how's that?

THE REPORTER: Okay. Yeah. Because I think you mentioned one, two, three, four different, like, sections. So you want to make everything that you said Exhibit 9?

MR. RUPCICH: I'm just -- I have a -- I think it's a -- it's a PDF that I pulled all of the pages that were from the topic, Annie, and put them into

3:22-cv-03052-CRL-DJQ  The Deposition of DR. NEIL FISHER, taken on August 15, 2025  # 150-25   Filed: 07/13/26   Page 16 of 16

30(b)(6)                                                                                          50..51

Page 50

one document. So if we want to go back on the record. I can actually say that, that I'll make Exhibit 9 excerpts from the 2014, 2018, and 2019 Consent Decree that are cited in topic 15. We could do that to make it clear.

MS. PROSSNITZ: Yeah. I think we should do that.

MR. RUPCICH: Okay. Is that right, Talia?

THE REPORTER: We're already on the record, so -- I didn't take us off. So we got all that.

(Exhibit 9 was marked for identification.)

MR. RUPCICH: So you got it all? Okay.

THE REPORTER: Yeah, I got that. Thank you. And then lastly, before I take us off, let's see, Plaintiff's side, are we ordering the transcript or the video?

MS. PROSSNITZ: Not today. Thank you.

THE REPORTER: Okay. And the defense, transcript of the video?

MR. RUPCICH: Not at this time.

THE REPORTER: Perfect. Sounds good. Well, with that, we are off the record. It is 2:08 p.m. Central.

(Deposition concluded at 2:08 p.m. CT)

Page 51

CERTIFICATE OF DIGITAL REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.

TALIA JACKSON,

DIGITAL REPORTER/NOTARY

COMMISSION EXPIRES: 11/28/2027

SUBMITTED ON: 09/22/2025